Robert E. VAN ARSDALL, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted on Reargument:
Oct. 15, 1986.
Decided: April 20, 1987.

William N. Nicholas (argued), of Vaughn & Nicholas, Dover, for appellant.

Richard E. Fairbanks, Jr. (argued), Chief of the Appeals Division, Wilmington, and Gary A. Myers, Deputy Atty. Gen., Georgetown, Dept. of Justice, Wilmington, for appellee.

Gary W. Aber, Esquire, of Heiman & Aber, Wilmington, amicus curiae.

Before CHRISTIE, C.J., and MOORE and WALSH, JJ.

CHRISTIE, Chief Justice:

Robert Van Arsdall was convicted of murder first degree as a result of a jury trial in Superior Court which was held in September 1982. This Court reversed his conviction, ruling that his constitutional right to confront the witnesses against him had been violated, and that the violation required reversal without inquiry into its prejudicial effect. *Van Arsdall v. State*, Del.Supr., 486 A.2d 1 (1984). On application by the State, the United States Supreme Court granted *certiorari* and subsequently vacated our decision. *Delaware v. Van Arsdall*, 475 U.S. ——, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The Supreme Court found that there had been a violation of the defendant's confrontation rights under the United States Constitution, but held that the error did not necessarily require reversal of the conviction since the error was subject to the harmless-error analysis set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Delaware v. Van Arsdall*, 475 U.S., at ——, 106 S.Ct., at 1438. On remand, we focus solely on the defendant's rights under the Delaware constitution and other State law. Because the conviction must be set aside under the law of Delaware, we do not reach the corresponding issues raised under federal law.

I

The evidence presented at trial revealed the following sequence of events. The killing occurred in Smyrna after a New Year's Eve party which began early in the afternoon of December 31, 1981, and had ended at about 10:30 p.m. The party had taken place in and between the adjacent apartments of Robert Fleetwood and Daniel Pregent. Pregent had become violent at several times during the party and had kicked and punched holes in a plasterboard wall upon being physically restrained by a guest.

Van Arsdall, who had visited the party briefly on two occasions earlier in the day, returned to Pregent's second-floor apartment by way of a back staircase at about

11:30 that night. Inside the apartment at that time were Pregent and Doris Epps, the victim, who was then asleep on a folded-out sofa bed. Across the hall in Fleetwood's apartment were Fleetwood and two other persons who had been at the party, Alice Meinier and Mark Mood.

At about 1:00 a.m. on January 1st, Alice Meinier answered a knock at the door of Fleetwood's apartment and encountered Van Arsdall. His shirt was splattered with blood and he was holding a bloody kitchen knife in his hand. Van Arsdall stated that he had been in a fight, but that he had "got them back." After entering Fleetwood's apartment and allowing Mood to take the knife from him, he said, "There's something wrong across the hall." Meinier then looked into Pregent's apartment and saw the body of the victim.

When the police arrived a few minutes later, they found the victim's mutilated body on the kitchen floor. The floor and surrounding furnishings were splashed with blood and tissue. Blood smears extended from the kitchen to the sofa bed in the next room. The police found Pregent asleep, wrapped in a blanket on the blood-drenched sofa bed.

Both Van Arsdall and Pregent were arrested and charged with murder.

In the early morning of January 1st, Van Arsdall gave a statement to the police in which he indicated that he had stepped out of the apartment and was not present when the killing occurred. Two days later, he recanted much of his earlier statement and told the police that he had lied to cover up for Pregent. In his second statement, Van Arsdall stated that he had fallen asleep on cushions at the foot of the sofa bed and was awakened when Pregent dragged the victim's body past him into the kitchen. He stated that Pregent had then started "cutting on her," and that he had tried to pull Pregent away, but Pregent had knocked him down.

At the trial of Van Arsdall, the State's case proceeded on the theory that Van Ars-

dall either killed Epps alone or he had assisted Pregent in killing her. The State relied heavily on the testimony of a forensic expert, Dr. Lee. Based on his examination of the blood patterns on Van Arsdall's clothing, Dr. Lee testified that the evidence was consistent with Van Arsdall having been in a standing position facing the victim's profusely bleeding arterial wound. Based on the blood on Pregent's furniture and floor, Dr. Lee was of the opinion that Van Arsdall initially stabbed Epps while the two of them stood near the sofa bed, and that Van Arsdall then dragged her into the kitchen where more wounds were inflicted. The blood on Pregent's clothing seemed to indicate lesser contacts with the source of the blood.

Fleetwood was the tenth of sixteen witnesses called by the prosecution. After describing the party including Pregent's violent outbursts, he stated that at about 11:30 p.m. he poked his head inside the door of Pregent's apartment and saw Van Arsdall sitting on the edge of the sofa bed next to Pregent's feet. On cross-examination, defense counsel sought to question Fleetwood about a public drunkenness charge against him which had been dropped shortly before trial. When the prosecutor objected on relevancy grounds, Fleetwood was questioned about the issue outside the presence of the jury. Fleetwood then testified that he understood that the charge against him had been dropped after he promised to appear the next day in the prosecutor's office to discuss the Epps murder. The trial judge sustained the objection to questioning Fleetwood on this subject before the jury and ultimately barred all cross-examination the defense tried to take as to Fleetwood's possible bias.[1]

Van Arsdall was the only witness for the defense. His testimony was consistent for the most part with his second statement to the police, in which he declared that Pregent was the only one who attacked the victim, and that he, Van Arsdall, became

1. Defendant also attempted to expose bias by cross-examining Fleetwood about a previous occasion in which a police detective questioned Fleetwood in connection with an investigation of an unrelated murder. The trial judge barred this line of cross-examination as well.

bloody when he tried to stop Pregent. The jury found Van Arsdall guilty as charged. At a later trial, Pregent was acquitted.

On appeal, this Court held that the restriction of bias cross-examination of Fleetwood concerning the drunkenness charge violated the defendant's right to confront the witnesses against him, a right secured both by the Sixth Amendment of the United States Constitution and article I, § 7 of the Delaware constitution. *Van Arsdall v. State*, 486 A.2d, at 6. Citing both state and federal decisions, we also ruled that "a blanket prohibition against exploring potential bias through cross-examination" was reversible error *per se*, "without inquiry into the actual prejudicial impact of the error." *Id.* at 7.

As indicated earlier, the United States Supreme Court granted *certiorari*, 473 U.S. 923, 105 S.Ct. 3552, 87 L.Ed.2d 674 (1985), and vacated our judgment. *Delaware v. Van Arsdall*, 475 U.S. ——, 106 S.Ct. 1431. The Supreme Court assumed that our decision rested on federal law because it lacked a "plain statement" to the contrary. *Id.*, at ——, n. 3, 106 S.Ct., at 1435, n. 3. The Court found that the trial judge's ruling which had prevented cross-examination relevant to bias did in fact violate the confrontation clause of the Sixth Amendment to the United States Constitution,[2] but held that federal law did not require automatic reversal. Instead, the Court ruled that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other confrontation clause violations, is subject to *Chapman* harmless-error analysis." *Delaware v. Van Arsdall*, 475 U.S., at ——, 106 S.Ct., at 1438.

On remand to this Court the State contends that the trial court's error was harmless under the analysis of *Chapman*. Defendant argues that the confrontation clause of article I, § 7 of the State constitution requires automatic reversal, and that, in any event, the error was not harmless. *Amicus* contends that the "judgment of his peers" clause of article I, § 7 of the State constitution requires automatic reversal, and further urges this Court to rule that, henceforth, attorneys and courts in Delaware must address State constitutional issues prior to federal constitutional issues.

We hold that the error was a violation of Delaware law and that, under Delaware law and the circumstances of this case, the error was not harmless. We do not hold that a reversal of the conviction is automatic under State law whenever cross-examination on bias is improperly restricted, and while we cite significant rulings of federal courts we do not base our decision on federal law. We also do not choose to set forth at this time a rule of procedure requiring a particular sequence of analysis with respect to issues arguably controlled by the State or Federal constitutions.

## II

The Delaware constitution guarantees that an accused shall have the right to "meet the witnesses in their examination face to face." *Del. Const.*, art. I, § 7.[3] This right necessarily includes the right to cross-examine; indeed, "the main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*." 5 J. Wigmore, *Evidence* § 1395 (3rd ed. 1940) (emphasis in original). The bias of a witness is subject to exploration at trial and is "always relevant as discrediting the witness and affecting the weight of his testimony." 3A J. Wigmore, *Evidence*, § 940 (Chadbourn rev.

---

**2.** The confrontation clause is applicable to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

**3.** In its entirety, article I, § 7 of the State constitution provides that:

In all criminal prosecutions, the accused hath a right to be heard by himself and his counsel, to be plainly and fully informed of the nature and cause of the accusation against him, to meet the witnesses in their examination face to face, to have compulsory process in due time, on application by himself, his friends or counsel, for obtaining witnesses in his favor, and a speedy and public trial by an impartial jury; he shall not be compelled to give evidence against himself nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land.

1970). Cross-examination on bias is an essential element of the right of an accused under the Delaware constitution to meet the witnesses in their examination. *See Wintjen v. State,* Del.Supr., 398 A.2d 780, 782 (1979).

■ Under Delaware's confrontation clause, the trial court erred when it foreclosed a legitimate inquiry into Fleetwood's possible bias in the circumstances present in this case. The inquiry concerning the dropping of a charge against Fleetwood was clearly relevant to the issue of bias,[4] and it was not improper. As we said in our earlier *Van Arsdall* opinion, "the trial court's decision to prohibit *all* questioning concerning the dismissal of charges against Fleetwood for public drunkenness prevented the jury from considering facts from which it could have drawn inferences about Fleetwood's testimonial reliability." 486 A.2d, at 6 (emphasis in original). We now hold that, under the circumstances, the trial court's blanket restriction on a legitimate line of bias cross-examination violated the defendant's confrontation rights as secured by article I, § 7 of the Delaware constitution.

## III

The defendant and *amicus* argue on several grounds that the State constitution requires automatic reversal where there has been, as in this case, a complete denial of otherwise proper cross-examination concerning potential bias.[5] First, relying on *Weber v. State,* Del.Supr., 457 A.2d 674 (1983), and our earlier *Van Arsdall* opinion, they contend that this Court has already interpreted the Delaware constitution to require automatic reversal under these circumstances. Second, defendant argues that we ought to "retain" the automatic reversal interpretation purportedly

adopted in our earlier *Van Arsdall* opinion because a court can only speculate as to the prejudicial impact of improperly excluded bias cross-examination. Third, *amicus* argues that the "judgment of his peers" clause in the State constitution bars a harmless-error analysis. We will discuss these arguments but will decide the case by applying a harmless-error analysis under Delaware law.

### A

Defendant and *amicus* urge that the *per se* reversal rule suggested in *Weber v. State,* 475 A.2d 674, and adopted in our earlier *Van Arsdall* opinion is still binding as State constitutional law precedent even though the United States Supreme Court ruled that it was not an accurate statement of federal law.

In *Weber,* this Court suggested that a limitation on bias cross-examination which rose to the level of a confrontation clause violation might always result in reversal. Although the Court applied a harmless-error analysis, 457 A.2d at 683, it noted that "[t]he standards used to determine if there is a violation of the confrontation clause in the first instance are similar, if not identical, to those used in deciding if the error was harmless. *Compare [United States v.] Summers,* 598 F.2d [450] at 461 [5th Cir.(1979)] *with Wintjen v. State,* Del. Supr., 398 A.2d at 782. *See also Chipman,* [*v. Mercer*], 628 F.2d [528] at 533 [9th Cir.(1980)]." *Id.* In our first *Van Arsdall* opinion we set forth the following test "consistent with *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and with our ruling in *Weber*":

> Where the record reflects a curtailment of a requested line of bias cross-examination *in limine,* so that the jury is unable

---

4. On *voir dire,* Fleetwood revealed the following:

Q [Mr. Reed]: "What was your understanding of why the charge was dropped? A [Fleetwood]: "Well, I did understand that I did feel that you wanted me to make sure that I knew what I was talking about, and I do feel that you wanted to make sure I had my story together before coming in here. So that is why I did feel that it was dropped."

5. Although the confrontation clause in the Federal Constitution does not require automatic reversal, (see *Delaware v. Van Arsdall,* 475 U.S. ——, 106 S.Ct. 1431), the State constitution may be interpreted so as to provide greater rights to defendants. *Goddard v. State,* Del.Supr., 382 A.2d 238, 240, n. 4 (1977).

to perform its fact-finding function in inferring bias from the testimony as a whole, we will assess cross-examination errors by a per se error standard. If, however, the trial court has permitted *some* cross-examination so that the jury has sufficient information from which to infer bias (should it so choose), this Court will evaluate error by application of the harmless constitutional error test of *Chapman v. California, supra* [386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] 486 A.2d, at 7 (*quoting Reed v. United States*, D.C.App., 452 A.2d 1173, 1176–1177 (1982)).

The *Weber* and *Van Arsdall* decisions indicate that this Court saw no need therein to articulate whether its remedy was based on State or federal law. The decisions do not make an explicit statement in that regard, and they cite State and federal rulings to support a single analysis. Without doubt, however, our analysis was influenced by the language of the United States Supreme Court in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, which had led other courts to conclude that certain limitations on relevant bias cross-examination were *per se* reversible error under the Sixth Amendment to the United States Constitution.[6] *See e.g., Springer v. United States*, D.C.App., 388 A.2d 846 (1978); *Chipman v. Mercer*, 628 F.2d 528 (9th Cir.1980). Now that the United States Supreme Court has clarified the *Davis v. Alaska* language by ruling that harmless-error analysis must be applied to restrictions on bias cross-examination which violate the Federal Constitution, there is reason to consider whether the State constitution requires automatic reversal.

For the reasons explained below, we are not prepared to rule that the Delaware constitution requires automatic reversal every time cross-examination of a witness on the issue of bias is improperly foreclosed by a ruling of a trial court.[7]

### B

■ Defendant contends that the State confrontation clause requires automatic reversal of a conviction where, as here, there has been a complete denial of otherwise proper bias cross-examination, because an appellate court can only speculate as to what effect the excluded evidence may have had on the judgment. We disagree. The reviewing court can assess the impact of the improper exclusion of evidence on the fact-finding process at trial by considering factors ascertainable from the trial record, *e.g.*, the importance of the testimony of the challenged witness, whether his testimony was cumulative, and the presence or absence of overwhelming evidence of guilt. *See Delaware v. Van Arsdall*, 475 U.S., at ——, 106 S.Ct., at 1438. This being the case, we see no justification to rule that the State confrontation clause requires automatic reversal here.

Constitutional errors which warrant automatic reversal are of such a magnitude that they "either abort[] the basic trial process, *Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (use of coerced confession), or den[y] it altogether, *Gideon v. Wainwright*, 372 U.S. 335, 83

---

**6.** *Davis v. Alaska* ruled that the defendant was "denied the right of effective cross-examination 'which would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" 415 U.S., at 318, 94 S.Ct., at 1111 (quoting *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968)). In *Delaware v. Van Arsdall* the Supreme Court stated that this language "merely reflects the view that on the facts of that case the trial court's error had done serious damage to the petitioner's defense." 475 U.S., at ——, 106 S.Ct., at 1437 (citation omitted).

**7.** Defendant also suggests that we adopted in our earlier *Van Arsdall* decision an automatic reversal rule as a matter of sub-constitutional state law based on the Delaware Rules of Evidence (D.R.E.). While *Weber* ruled that the exclusion of evidence of possible bias in that case was reversible error under the D.R.E., 457 A.2d, at 680–682, there is no such analysis in *Van Arsdall*. The isolated comment in *Van Arsdall*, 486 A.2d, at 7, that the trial judge "abused his discretion" in barring bias cross-examination of Fleetwood cannot be read to support an evidentiary rule of automatic reversal, particularly where the decision nowhere mentions the D.R.E., and where the D.R.E. itself calls for a harmless-error approach. *See* D.R.E. 103(a) ("error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected....")

S.Ct. 792, 9 L.Ed.2d 799 (1963) (denial of counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased adjudicator)." *Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 3106, n. 6, 92 L.Ed.2d 460 (1986). A confession, for example, is so central to the ultimate question of guilt or innocence that the admission of an unconstitutionally obtained confession invariably denies the defendant his right to a fair trial. In contrast, the impact of bias cross-examination varies according to the factors identified above, and in certain circumstances may have no effect on the judgment.[8]

## C

◼ *Amicus* contends that automatic reversal is required, not only by the State confrontation clause, but also by that provision of article I, § 7 of the State constitution which declares that an accused "shall not be deprived of life, liberty or property, unless by *the judgment of his peers* or by the law of the land." (emphasis added) The crux of this argument is that harmless-error analysis, by requiring a reviewing court to assess the impact of an error on the "minds of an average jury," *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), usurps the function of the jury and denies the accused his right to a "judgment of his peers."

In words which appear prior to the language guaranteeing an accused the right to a "judgment of his peers," article I, § 7 of the State constitution provides that he has a right to a "trial by an impartial jury."[9] The right to a jury trial, which is stated in words identical to its counterpart in the Sixth Amendment to the United States Constitution, necessarily encompasses the right to be judged by a jury of one's peers. *See Duncan v. Louisiana,* 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968) (In discussing the scope of the jury trial clause, the Supreme Court noted that "[p]roviding an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge"). *Amicus* presents no persuasive evidence that the "judgment of his peers" clause was intended to have an independent meaning apart from the jury trial clause.[10] The purpose of the "judgment of his peers" clause appears to be to reaffirm that the State may not deny life, liberty, or property in serious criminal cases without the benefit of a jury trial.[11]

*Amicus'* argument also misconstrues the nature of harmless-error analysis. The reviewing court considers the probability that

---

8. Defendant urges that we interpret the State constitution to require automatic reversal in order to send an unequivocal message to trial judges to allow some bias cross-examination. The ruling of the United States Supreme Court in *Delaware v. Van Arsdall,* that denial of otherwise proper bias cross-examination violates a defendant's federal confrontation clause rights, sends a clear message to trial courts. "No judge welcomes or can ignore being told that he has committed a constitutional violation, even if the conviction is saved by a harmless error finding." *Id.,* 475 U.S., at ——, 106 S.Ct., at 1439 (White, J., concurring).

Defendant also states that application of harmless-error analysis will encourage the State to violate the confrontation rights of future defendants. We think the State will not be tempted to violate this clause when, under either the federal or state harmless constitutional error analysis, reversal is required unless the State can prove beyond a reasonable doubt that the violation did not affect the verdict (see discussion in Part V, *infra.*).

9. The text of article I, § 7 is set forth at note 2, *supra.*

10. *Amicus* points out that, during the debates preceding the enactment of our current State constitution in 1897, future Judge William C. Spruance stated: "Judges shall confine themselves to their business, which is to adjudge the law and leave juries to determine the facts." III *Debates and Proceedings of the Constitutional Convention of the State of Delaware 1896–1897,* p. 1730 (1958); *see also Storey v. Camper,* Del. Supr., 401 A.2d 458, 463 n. 4 (1979). There is no evidence that this statement was intended to bar harmless-error analysis, which, as of 1898, had already been adopted in several American jurisdictions. *See* cases cited in *Fisher v. State,* Del.Supr., 41 A. 184 (1898).

11. The right to a jury trial applies only to "serious offenses." *See, e.g., Thomas v. State,* Del. Supr., 331 A.2d 147 (1975); and *Duncan v. Louisiana, supra.*

an error affected the jury's decision. To do this, it must study the record to ascertain the probable impact of·error in the context of the entire trial. The analysis does not direct the court to substitute its own judgment for that of the jury regarding the correctness of the verdict.[12]

## IV

■ Since there is no basis in this case under State constitutional law for automatic reversal of the trial court, this Court will apply harmless-error analysis to this violation of the State constitution.[13] In applying a state harmless-error rule, we will follow the method of analysis set forth in an early decision of this Court, and we will apply as State law the rigorous standard of proof of the *Chapman* case. Although we decide this case solely under State law, we are of the opinion that the same result would be reached under the federal harmless-error analysis.

In its first decision reviewing a criminal conviction on appeal, this Court adopted a harmless-error approach to mistakes at trial. *Fisher v. State*, Del.Supr., 41 A. 184 (1898).[14] The *Fisher* court stated, "It is not every error that will justify reversal, and it is not every mistake that may be made in the hurry of a trial that will warrant the setting aside of the judgment of that tribunal." *Id.* Instead, retrial is required when an error at trial is "injurious"

to the accused. *Id.*, at 185. Since then, this Court has consistently refused to reverse convictions for errors found to be harmless. *See, e.g., Lowber v. State*, Del. Supr., 100 A. 322, 323 (1917) (erroneous prohibition of testimony of defendant concerning circumstances surrounding incriminating pretrial statements; held harmless); *Bove v. State*, Del.Supr., 134 A. 630, 631 (1926) (defendant claimed that the trial court erroneously permitted the State to elicit impermissible character evidence from a witness; held, error (if any) was harmless); *Tucker v. State*, Del.Supr., 187 A.2d 429, 431 (1963) (admission of evidence of defendant's silence in face of accusation may have been error but was harmless in any event).

The *Fisher* court scrutinized the record "to consider the other evidence in the case, for the purpose of arriving at a conclusion as to the effect that the testimony to which exception was taken may have had upon the minds of the jury in arriving at their verdict." 41 A., at 185. This approach indicates that the reviewing court must consider both the importance of the error and the strength of the other evidence presented at trial. An error may be important if, for example, it concerned a witness giving significant testimony or if it concerned evidence obtained only from testimony erroneously admitted. It is necessary to review the entire record to deter-

---

**12.** Former Chief Justice Roger Traynor of the California Supreme Court, in his oft-quoted monograph, *The Riddle of Harmless Error*, 35–36 (1970), also rejected the argument that "a judge, purporting to evaluate the influence of error as he reviews the record, is realistically driven to evaluate the correctness of the judgment, perforce acting as trial judge or jury." He explained:

Concededly, once [an appellate judge] undertakes to evaluate error, he is driven to reviewing the whole record, even to weighing the evidence. Nevertheless I believe that in the process it is possible for him deliberately to put aside the question of the correctness of the judgment. Given the will, he finds intuition and reasoning working as one to keep his inquiry in focus on the degree of probability that error influenced the result. In that focus the usual errors—misconduct, erroneous rulings on admissibility of evidence, erroneous instructions—take on a new aspect. Some

appear tentatively prejudicial at the outset by their very magnitude, and unquestionably so when the evidence supporting the result lacks the magnitude to dissipate them. Some, not of themselves clearly prejudicial or clearly harmless, cast a cloud on the result that compels an inference of prejudice unless they are likewise so dissipated. Some are dissipated by a record so overwhelmingly supporting the result that any other, even though tenable, is reduced to a mere possibility.

**13.** We address here the standard for review of State *constitutional* errors only. *But see* Superior Court Criminal Rule 52(a); Superior Court Civil Rule 61; and Rule 103(a) of the Delaware Rules of Evidence, all of which illustrate the wide application of harmless-error analysis.

**14.** The current State constitution (adopted in 1897) granted for the first time the right of appellate review from criminal convictions.

mine the significance of the error. If the untainted evidence of guilt is overwhelming, the court may be convinced that the error in question did not affect the verdict. Ultimately, the Court must weigh the significance of the error against the strength of the untainted evidence of guilt to determine whether the error may have affected the judgement. *See* R. Traynor, *The Riddle of Harmless Error*, p. 36 (1970) at n. 11 *supra*.

In view of the fundamental nature of the rights guaranteed under the State constitution, we adopt as State law a standard such as that used by the *Chapman* court, whereby reversal is required whenever the reviewing court "cannot say that the error was harmless beyond a reasonable doubt." *Chapman*, 386 U.S., at 24, 87 S.Ct., at 828.

## V

■ Under this standard we now consider whether the State constitutional error in this case was harmless.

Robert Fleetwood testified concerning the events of the day preceding the murder, including the party, Van Arsdall's brief appearances, and several violent outbursts on the part of Pregent. He also testified that, between 11:00 and 11:30 p.m., he poked his head inside the door of Pregent's apartment and saw Van Arsdall seated on the edge of the bed and Pregent's feet hanging over the end of the bed.

Fleetwood's comments about the party were not in dispute and were largely corroborated by the testimony of other witnesses. Similarly, there was no dispute that Van Arsdall had returned to Pregent's apartment at about 11:30 p.m. and was in the building when the murder occurred. Defense counsel acknowledged in his opening remarks that Van Arsdall was there at the crucial time, describing the case as one "of an innocent young man who had the misfortune to be in the wrong place at the wrong time." The jury received transcripts of two statements made by Van Arsdall to the police in which he stated that he arrived back at Pregent's apartment at about 11:30 p.m. Van Arsdall himself admitted at trial that he returned to Pregent's apartment at about that time.

Fleetwood's testimony, standing alone, appears to have established nothing with regard to the fact of Van Arsdall's presence at the scene of the crime which could have had an effect on the jury's verdict.

However, it appears that Fleetwood's testimony may have been significant in that he claimed that *he saw* Van Arsdall shortly before the murder. Defense counsel stated in his opening remarks that Van Arsdall had entered Pregent's apartment by way of a back staircase, unseen by anyone except Pregent and Epps, and counsel argued in closing that, if Van Arsdall had committed the murder, he could have easily left the scene of the crime without anyone having seen him. Counsel suggested that Van Arsdall's decision to cross the hall and alert others that something was wrong showed his innocence.

In view of this argument casting Van Arsdall's post-crime actions in an exculpatory light, Fleetwood's statement that he saw Van Arsdall in Pregent's apartment at about 11:30 p.m. may have had some significance. First, the statement tended to rebut the defense counsel's argument that Van Arsdall could have left the scene of the crime unnoticed. Second, the statement gave rise to an inculpatory explanation concerning Van Arsdall's decision to cross the hall to Fleetwood's apartment with the murder weapon in his hand. The prosecutor, in cross-examining Van Arsdall, gave voice to this alternative explanation in a series of questions climaxing in this final exchange:

Q: [Mr. Reed] Are you sure you didn't cross the hall to kill [Fleetwood]?

A: [Van Arsdall] Yes, I'm sure.

In cross-examining Fleetwood, defense counsel sought to show that the prosecutor had offered Fleetwood a "deal" in order to get him to talk to the prosecutor. Fleetwood had agreed to discuss the murder with the Attorney General's Office in exchange for the dropping of a drunkenness charge against him. If the damaging potential of this line of cross-examination

were fully realized, the jury may well have believed that Fleetwood in fact did not see Van Arsdall at 11:30 p.m. Instead, the jury may have concluded that Fleetwood lied about having seen Van Arsdall in order to help the prosecution. If so, the claim of the defense that Van Arsdall was seen by no one but Pregent and Epps may have remained unrebutted, and Van Arsdall's behavior after the killing might have been regarded as exculpatory.

Without the bias cross-examination, there was a greater probability that the jury believed that Fleetwood saw Van Arsdall in Pregent's apartment shortly before the murder. In light of the cross-examination of Van Arsdall quoted above, the jury may have surmised that Van Arsdall also might have seen Fleetwood and had crossed the hall with the intent to eliminate a possible witness.

Apart from the impact that a full cross-examination might have had on the credibility of Fleetwood's testimony, and, by extension, on the defense's argument that Van Arsdall's actions were consistent with his innocence, a revelation to the jury that the prosecutor before them made a "deal" with Fleetwood also may have affected the jury's view of the strength of the prosecution's case as a whole.[15] The defense counsel pointed out in both his opening remarks and his closing argument that the State merely offered alternative theories of guilt. He argued from this that the State did not really know how Epps was killed. Evidence that the prosecutor dropped a charge against a witness shortly before the trial in order to gain more information may well have been used by defense counsel in support of his argument that the State had little confidence in its own case.

An error such as this, which cannot be said to be entirely without significance, may yet be deemed harmless if it occurs in a trial in which the prosecution presented "overwhelming" untainted evidence of guilt. For example, in *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), a defendant's confrontation rights were violated when the confessions of two codefendants who did not take the stand were used against him.[16] The two "tainted" pieces of evidence placed him at the store at the time of the crimes and implicated him in them. However, the defendant himself admitted that he was at the scene of the crimes. The testimony of the fourth codefendant (who was cross-examined), as well as that of the victims, indicated that the defendant participated in the crimes. Noting the "overwhelming" evidence against the defendant and the cumulative nature of the codefendant's statements improperly allowed to go to the jury, the Supreme Court held that any error was harmless beyond a reasonable doubt. *Id.*, 395 U.S., at 254, 89 S.Ct., at 1728.

Again in *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the Supreme Court held that the improper admission of a codefendant's statement was harmless error in light of the overwhelming evidence of the defendant's guilt. In that case, a murder prosecution, the defendant gave a minutely detailed confession which was completely consistent with the objective evidence. *Id.*, 405 U.S., at 430, 92 S.Ct., at 1059. The inadmissible statement was deemed to have merely tended to corroborate certain details of defendant's comprehensive confession. *Id.*

More recently, in *Burns v. Clusen*, 798 F.2d 931 (7th Cir.1986) unusually strong physical evidence contributed to a finding of harmless error in the face of a confrontation clause violation. The reviewing court ruled that the use of the pretrial testimony of a sexual assault victim by the prosecution, without adequately establishing that the victim was unavailable to appear at trial, violated the confrontation clause. Nonetheless the court found the admission of the victim's testimony, which

---

**15.** The prosecutor who presented the evidence and argument to the jury was the same person who signed the papers dropping the criminal charge against Fleetwood.

**16.** The defendant and three codefendants were found to have participated in an attempted robbery in the course of which a store employee was killed. Each was found guilty of felony murder and sentenced to life imprisonment.

identified the defendant as her assailant, to be harmless beyond a reasonable doubt. The court ruled that her testimony was "only cumulative" because, apart from that testimony, the physical evidence of defendant's jacket (stained with the victim's rare blood type present in only three percent of the population), the similar crime committed against a witness in the same vicinity earlier the same day, and that witness's identification of the defendant at trial, together constituted "overwhelming evidence that would lead to the same jury determination of guilt." 798 F.2d, at 944.

In *Harrington, Schneble,* and *Burns,* the jury had either the benefit of direct evidence from witnesses who actually saw the crime take place, or other unusually strong evidence. The State's case against Van Arsdall, on the other hand, proceeded on the basis of circumstantial evidence and involved a situation in which there was evidence which suggested that another man, namely Pregent, may have committed the crime. The evidence showed that Van Arsdall exited from Pregent's apartment with the murder weapon in his hand. His shirt and pants were splattered with blood. His watch, with a small piece of the victim's tissue on it, was admitted into evidence. The State's forensic expert, Dr. Lee, testified that the patterns of blood on Van Arsdall's clothing were consistent with those that would be caused by arterial wounds, spurting upwards at a forty degree angle, indicating that Van Arsdall was in close proximity to the victim while she was bleeding profusely.

Van Arsdall disputed none of this evidence but claimed that Pregent, whose clothes were also stained with some blood, was the sole attacker.[17] Van Arsdall testified at trial that, as Pregent was knifing the victim, he attempted to intervene and was pushed to the floor alongside the victim. This might explain the blood on his clothing. He also claimed that he removed the knife from the body and took it across the hall to prevent Pregent from attacking anyone else.

Although the evidence pointing to Van Arsdall's guilt was strong, it was not overwhelming. There was no direct evidence. The circumstantial evidence would have permitted the jury to draw the inference that Pregent may have committed the murder.[18] Also, there was nothing in the record to indicate why Van Arsdall may have wanted to kill the victim, whom he apparently did not know until the day before.

Given the possible significance of the restriction on bias cross-examination of Fleetwood and the special circumstances surrounding the crime, including the absence of strong direct evidence of guilt, we are not convinced beyond a reasonable doubt that the State confrontation clause error of the trial court in excluding cross-examination as to bias did not affect the jury's verdict.

Since the error was not harmless under Delaware law, we must reverse the convictions and remand for a new trial.

---

**17.** Pregent's pants were soaked with blood at the knees. From this evidence the jury could have inferred that he had been kneeling in a pool of blood.

**18.** In addition to the evidence concerning blood on Pregent's clothing, there was also evidence that Pregent had had several violent outbursts, at least one of which was directed at a woman, during the party the day before. As indicated above, Pregent was later tried for the murder but was acquitted.