IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IRVAN ADAMS, | § | No. 700, 2014 |
| | § | |
| Defendant Below, | § | |
| Appellant, | § | Court Below – Superior Court |
| | § | of the State of Delaware in and |
| v. | § | for Kent County |
| | § | |
| STATE OF DELAWARE, | § | Cr. Id. No. 1310005383 |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: August 19, 2015
Decided: September 28, 2015

Before **STRINE**, Chief Justice; **VALIHURA**, and **SEITZ**, Justices.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED.**

Bernard J. O'Donnell, Esquire, Office of Public Defender, Wilmington, Delaware, for Petitioner Below, Appellant, Irvan Adams.

John R. Williams, Esquire, Deputy Attorney General, Dover, Delaware, for Plaintiff Below, Appellee, State of Delaware.

SEITZ, Justice:

## I.    Introduction

In October, 2014, a Superior Court jury convicted Irvan Adams of possession of a firearm by a person prohibited, possession of ammunition by a person prohibited, carrying a concealed deadly weapon, and conspiracy second degree. The Superior Court judge sentenced Adams to five years at Level V on the conviction for possession of a firearm by a person prohibited, and suspended the terms of imprisonment on the remaining offenses for probation.

Adams raises one issue on appeal. He claims the Superior Court abused its discretion when it refused to admit into evidence a prior consistent statement of Adams's brother, Javan Cale. Adams claims the affidavit supported Cale's exculpatory testimony at trial and rebutted the State's implication of recent fabrication on Cale's part. The trial judge refused to admit the affidavit, ruling it was superfluous.

We find that the trial court erred when it sustained the State's objection and excluded the affidavit from evidence, and that the exclusion was not harmless error beyond a reasonable doubt. We therefore reverse Adams's conviction and remand for proceedings not inconsistent with this opinion.

## II.    Facts And Procedural History

On October 8, 2013, Dover Police Corporal Thomas Hannon, Detective Mark Hurd, and Probation Officer Daniel Stagg stopped the car driven by Cale for

a burned out brake light.[1] Adams was seated in the front passenger side seat. Erick Morton, a cousin of Cale's girlfriend, sat in the rear passenger side seat.[2] The occupants were removed from the car while the Officers searched the car after smelling marijuana.[3] The Officers found a Snake Slayer Colt .45 handgun under the driver's front seat where Cale had been sitting. Underneath the front passenger seat where Adams had been seated the Officers found a loaded 10 millimeter Glock Model 20 semi-automatic pistol. After the Officers took the car from the scene and searched it further, they found a loaded 9 millimeter Glock Model 19 semi-automatic pistol underneath the rear passenger seat that had been occupied by Morton.[4]

At the Dover police station, upon questioning, Adams initially invoked his *Miranda* rights. According to Corporal Hannon, as he was being escorted to his cell and told what the charges were, he became upset and started to explain what happened. Corporal Hannon testified that Adams told him that Adams's brother, Cale, called Adams the night before and said he had been robbed at gunpoint. He also testified that Adams told him that his purpose in coming to Dover was to help his brother find the person who robbed him.[5] Corporal Hannon testified that

---

[1] App. to Answering Br. at 2 (Trial Test. of Cpl. Thomas Hannon, Oct. 13, 2014).
[2] *Id*. at 3.
[3] *Id*. at 2-4.
[4] *Id*. at 4, 7; *id*. at 17 (Trial Test. of Officer Daniel Stagg, Oct. 14, 2014).
[5] *Id*. at 8-9 (Trial Test. of Cpl. Thomas Hannon, Oct. 13, 2014).

Adams admitted he knew about the guns but Adams told him he did not plan to use them because "he was a country boy who used his hands."[6] Probation Officer Stagg, who discovered the loaded 10 millimeter Glock under the front passenger seat, testified that it was accessible to Adams.[7] Adams was a convicted felon prohibited from possessing a firearm.[8]

Before Adams's trial, Cale pled guilty to possession of a firearm by a person prohibited, two counts of carrying a concealed deadly weapon, and conspiracy.[9] He had been sentenced by the time of Cale's trial and had served a prison sentence and was out on work release.[10] The State called him as a witness at Adams's trial. The State played Cale's taped interview with police after his arrest.[11] In the interview Cale first admitted responsibility for only one gun. After Detective Hurd, who was interviewing him, told Cale that the police had found three guns, Cale changed his story and admitted all three guns belonged to him. He said he gave one of the firearms to Adams and another to Morton before Cale, Adams, and Morton went looking for the person who had robbed Cale at gunpoint.[12] Cale said

---

[6] *Id*. at 9.
[7] *Id*. at 18 (Trial Test. of Officer Daniel Stagg, Oct. 14, 2014).
[8] *Id*. at 9 (Trial Test. of Cpl. Thomas Hannon, Oct. 13, 2014).
[9] *Id*. at 21 (Trial Test. of Javan Cale, Oct. 14, 2014).
[10] App. to Opening Br. at 90-91 (Trial Test. of Javan Cale, Oct. 14, 2014).
[11] App. to Answering Br. at 24 (Trial Test. of Det. Scott Andrew Hurd, Oct. 14, 2014).
[12] App. to Opening Br. at 68-72 (Trial Test. of Javan Cale, Oct. 14, 2014).

in the interview he did not know where the gun he gave Adams was found by police because he did not know where Adams put it.[13]

At Adams's trial, Cale testified to yet another version of events.[14] Regarding the firearms, he testified that he had been target shooting the night before the robbery and had left the guns under the seat.[15] He also claimed that neither Adams nor Morton knew the handguns were under their seats.[16] He testified he was high on marijuana when he was earlier questioned by police and had "made up stories" because he was scared.[17]

Morton testified at Adams's trial that he was aware that Cale had been robbed, but there was no discussion of guns in the car.[18] Adams also testified at his trial, and claimed that, although his brother was upset, there was no discussion of guns and he was unaware of guns in the car.

Pertinent to this appeal, during redirect examination of Cale by the State at Adams's trial, the State asked pointed questions consistent with the State's theme that Cale's account at Adams's trial was a recent fabrication as to how the guns had gotten into the car. After showing the jury Cale's taped interview with police,

---

[13] *Id*. at 104.

[14] The State also tried Morton on weapons charges. During Morton's trial, Cale told three different versions of how the firearms ended up under the car seats. *Morton v. State*, 2014 WL 7252046, at *1 (Del. Dec. 19, 2014).

[15] App to Opening Br. at 40 (Trial Test. of Javan Cale, Oct. 14, 2014).

[16] *Id*. at 82.

[17] *Id*. at 45, 62, 87, 99.

[18] Opening Br. at 5.

5

the State in its questions suggested Cale was telling a different story at Adams's trial because, having pled guilty and already been sentenced, Cale was no longer concerned for himself and was now seeking to help his brother:

> Prosecutor: [In the taped interview with police], you were trying to help yourself by cooperating, right?
>
> Cale: I guess, yes, yes.
>
> Prosecutor: Yes. And by cooperating, that meant telling Detective Hurd everything that had happened and how those guns ended up in your car; isn't it true?
>
> Cale: Yes. Yes. You can say yes.
>
> Prosecutor: And how you had given the ten millimeter Glock to your brother. That's what you said?
>
> Cale: Yeah, I guess. Yes.
>
> Prosecutor: So to help yourself you essentially threw your brother under the bus, and now he's – you put a gun in his hand, didn't you?
>
> Cale: I guess you could say that.
> . . . .
> Prosecutor: But by the end of [the interview with police], an interview where, by your own admission, you were trying to help yourself by cooperating with the police, you went from, I had one gun and I was on my way to Little Caesars, to, there were three guns, they were all mine, I gave the other two to my brother and to Erick, and we were looking for the guy who robbed me. Isn't that how it went?
>
> Cale: Yeah, I guess.
> . . . .
> Prosecutor: And how did you put it? This is the honest-to-god truth? Do you remember you saying that story?

Cale:         Yeah, from seeing it.

Prosecutor:  Right.  And now you're sitting here having been convicted of those four crimes, possession of a firearm by a person prohibited, two counts of carrying a concealed deadly weapon for the other two guns in your car, and conspiracy?

Cale:         Mm-hmm.

Prosecutor:  Having pled guilty freely and voluntarily with full knowledge of what those offenses were all about and the possible penalties you faced?

Cale:         Mm-hmm.

Prosecutor:  You're now saying: I didn't give my brother the gun and he didn't know it was in the car?

Cale.         No, he didn't know it was in the car.

Prosecutor.  Alright.  And that's because you love your brother and you don't want to see him get into trouble because your case is over?

Cale.         No.

Prosecutor.  Now it's his turn for you to help him?

Cale.         No, because that's the truth.

Prosecutor.  Right.  I have no further questions.[19]

---

[19] App. to Opening Br. at 102-06 (Trial Test. of Javan Cale, Oct. 14, 2014).

In response, defense counsel sought on Cale's re-cross examination to introduce a two-sentence 2013 affidavit executed by Cale about a week after Cale was arrested.[20] Cale states in the affidavit:

> I, Javan Cale, clearly state that on October 8, 2013 the weapons found in my trunk by the Dover Police Department belong to me. Furthermore, the other people in the vehicle (Irvan F. Adams, Jr. and Erick Morton) had no knowledge that the weapons were in the vehicle.[21]

The State objected on two grounds:

> First of all, there was reciprocal discovery in this matter, and that document has never been provided to the State. Second of all, that question would potentially elicit the contents of that document and what it is, and that's what we're objecting to.[22]

That is, the State appeared to object on the basis that: (1) the defense never provided it a copy of the affidavit despite reciprocal delivery obligations; and (2) that the affidavit was inadmissible hearsay. Defense counsel represented to the court that he provided the affidavit to the State "early on as soon as it was executed in order to try to resolve the matter."[23] He argued that the affidavit should be admitted because it was "within the scope of the [State's] redirect" in light of the State's focus on Cale's inconsistency, and because it "solidifie[d]" Cale's account

---

[20] *Id*. at 106-07.
[21] *Id*. at 116.
[22] *Id.* at 107.
[23] *Id*. at 107.

8

at trial, having been executed just eight days after Cale's arrest.[24] Although defense counsel could surely have been clearer, he was noting that the affidavit was made at a time when Cale faced criminal jeopardy and offering this to rebut the State's claim that Cale had changed his story to help his brother only after he himself no longer faced criminal consequences. The trial judge, after suggesting on his own instance and without an objection on that ground from the State that the affidavit might have been cumulative, denied the request to admit the affidavit, ruling: "This is of marginal value. It probably was not provided previously, though it presumably should have been, so I'm not going to admit it."[25]

Before Cale's testimony continued the following morning, defense counsel raised Cale's affidavit again. Defense counsel confirmed that Cale's affidavit was drafted in preparation for a preliminary hearing and was hand-delivered to the State to resolve the charges against Adams at that time.[26] That confirmation therefore addressed the State's primary objection and the trial judge's primary basis for excluding the affidavit. Defense counsel then renewed his request to introduce Cale's affidavit as "a statement made shortly after . . . that agrees with what he's saying today."[27] After a colloquy with defense counsel, the trial judge

---

[24] *Id.* at 109-10.
[25] *Id.* at 114.
[26] *Id.* at 117.
[27] *Id.* at 118.

confirmed his earlier ruling excluding the affidavit but based it on his own determination that the affidavit was cumulative:

> I don't think that changes anything . . . as . . . it's not necessary for admissibility . . . . I think this is completely superfluous. There have been four or five versions on details relative to Mr. Cale's concept of the thing. He's given different detailed descriptions within each time he was questioned: At the police station, in the original trial, yesterday in trial. I think anything like that is totally superfluous.[28]

Despite having gotten the affidavit excluded, the State continued to stress that Cale was telling a new story now that he faced no jeopardy to himself. For example, after the exclusion of the affidavit, Cale then returned to the stand and the prosecutor continued to question him about the inconsistencies in his testimony:

> Prosecutor: Essentially, you're willing to say anything and everything to get yourself out of trouble aren't you?
>
> Cale: Right.
>
> Prosecutor: And you're willing to do that for your friends and your brother, aren't you?
>
> Cale: No, I'm just here to tell the truth.[29]

In its closing argument, the State zeroed in on Cale's testimony as the lynchpin of the State's case. At the start of the State's closing argument, after reciting the elements of the crime, the State immediately brought up Cale's testimony:

---

[28] *Id*. at 118-19.

[29] Transcript of Trial at C21-22, *State v. Adams*, No. 1310005383 (Del. Super. 2014).

When I was thinking about this case and primarily Javan Cale's statement to Detective Hurd within hours of his arrest, the arrest of the defendant back at the police station on October 8, a good quote came into my head: "Oh, what a tangled web we weave when first we practice to deceive." . . . Clearly, the evidence shows Javan Cale was practicing to deceive.[30]

Still early in its closing argument, the State argued:

Nobody can argue that Javan Cale's testimony has been consistent or his statements. The motives actuating any witness. Javan Cale told you and he told the jury in the prior proceeding in which he testified that his interest was to save himself, to help himself; that he was willing to say and do anything to help himself. And when he was arrested on October 8, he knew he was in trouble. His case is over. He's resolved it. Now he's here to testify for his brother. And that goes to what the judge has already told you. Not only the motives actuating any witness; the fact, if it is a fact, that the testimony has been contradicted or corroborated by the other evidence; the bias, prejudice, or interest, if any; the manner or demeanor upon the witness stand; and all other facts and circumstances shown by the evidence which affect the credibility of the testimony.[31]

Then, after discussing the other evidence, including Cale's recorded statements at the police station, the location of the pistol under Adams's seat, and Adams's own unrecorded statement to Corporal Hannon that he knew the guns were in the car, the State argued that the jury could find that Adams had knowledge of the pistol by looking to Cale's statement at Morton's trial:

The other way you would get that knowledge, the fourth aspect that you should consider, is that after Javan Cale had taken his plea on

---

[30] *Id.* at C169-70.
[31] *Id.* at C170-71.

April 7 of this year, had been sentenced to jail, was then brought into a court to testify at Erick Morton's trial, he's done. Nothing more is going to happen to him. So what do I do? Well, I'll help my girlfriend's cousin.[32]

Next, the State asked the jury to take into consideration "not only the defendant's motives but his own brother's motives . . . ."[33] The State further urged the jury to consider Cale's initial admissions when he still faced penal consequences and later changed his story:

What Javan Cale, [Adams's] brother, co-conspirator, initially told the police trying to be more helpful to himself because he knew he was in trouble . . . And you can consider that when you consider the credibility of his statement. He dug a deeper hole for himself trying to help himself by cooperating. . . . Or are you trying to cooperate to help yourself in the long run and now when you don't have to, you decide to help your brother? Because you heard the testimony of Javan Cale during this trial versus what he said in the last trial versus what he said to Detective Hurd. Who was he helping? That's for you to decide.[34]

Finally, near the end of his closing argument, the State referred to Cale as "the main character in this case":

You have a lot to sort through, ladies and gentlemen. There have been different statements made by the one person who, clearly, is the main character in this case, Javan Cale. No doubt you heard it, you've seen it. He's given different versions.[35]

Following deliberations, the jury convicted Adams on all charges.

---

[32] *Id.* at C174.
[33] *Id.* at C180.
[34] *Id.* at C180-81.
[35] *Id.* at C186.

### III. Discussion

Adams argues on appeal that it was an abuse of discretion to exclude Cale's affidavit because it was offered, not for the purpose of cumulating evidence that Adams was unaware that a gun was beneath his seat, but instead for the purpose of rebutting the State's implied charge of recent fabrication against Cale.[36] Executed before Cale pled guilty, Adams claims that the affidavit contradicted the State's implication of Cale's recent fabrication of events at Adams's trial after his own responsibility for the events of October 8, 2013 was resolved. Adams contends that a prior consistent statement offered for a legitimate purpose under Rule 801(d)(1)(B) should not be excluded as cumulative because a prior consistent statement is by definition cumulative, and excluding such statements on that ground would render Rule 801(d)(1)(B) a nullity.[37] Adams posits that the error in this case was not harmless beyond a reasonable doubt because the case was a close one, as evidenced by the fact that Adams's co-defendant Morton was acquitted on charges of possession of a firearm by a person prohibited, possession of ammunition by a person prohibited, and carrying a concealed deadly weapon after presentation of similar evidence to the jury at his trial.

---

[36] Opening Br. at 9.
[37] *Id.*

The State argues in response that the affidavit was cumulative to Cale's trial testimony, his prior statements to police, and his testimony at Morton's trial because it added nothing to those statements.[38] The State claims in the alternative that, if the trial judge's ruling was an abuse of discretion, it was at worst harmless error beyond a reasonable doubt because the jury heard testimony from Corporal Thomas Hannon that Adams had acknowledged to him the day of his arrest that he knew there were guns in Cale's vehicle.[39]

We review a trial court's evidentiary rulings for abuse of discretion.[40]

### Cale's Affidavit Was Admissible Under DRE 801

Hearsay evidence is generally not admissible unless subject to an exception under the Delaware Rules of Evidence ("DRE").[41]  DRE 801(d)(1) addresses prior statements of witnesses and provides that such a statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, or (B) consistent with his testimony and is offered to rebut an express or implied

---

[38] Cale's statement to police and his testimony at Morton's trial were introduced into evidence by the State under Rule 801(d)(1)(A) as non-hearsay prior statements inconsistent with Cale's trial testimony.

[39] Answering Br. at 11-12.

[40] *Jones v. State*, 940 A.2d 1, 9 (Del. 2007).

[41] D.R.E. 802.

14

charge of recent fabrication or improper influence or motive . . . ."[42]  A charge of recent fabrication "can be accomplished by several means of impeachment, including opposing counsel's questions and the introduction of prior inconsistent statements."[43]

Cale's affidavit was not hearsay because he testified at trial and was available for cross-examination, the affidavit is consistent with his trial testimony, and the affidavit tended to rebut the State's charge that Cale recently fabricated his trial testimony to help his brother now that Cale was out of jeopardy.  The State focused its redirect examination to draw contrasts between Cale's prior statements to the police and his testimony at Adams's trial.  Cale's case had been resolved and he was no longer in fear of any personal consequences from the incident.  Cale's affidavit pre-dated the resolution of his own case and was consistent with his testimony at trial in Adams's case.  It tended to rebut the State's implication that Cale had recently made up his current version of events at Adams's trial, based on a newfound interest in helping his brother.

The Superior Court ruled that the affidavit was superfluous, which we interpret to mean redundant or cumulative.  But, the State itself actually never

---

[42] D.R.E. 801(d)(1).  *See also* 11 *Del. C.* § 3507 ("the voluntary, out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value . . . . The rule . . . shall apply regardless of whether the witness' in-court testimony is consistent with the prior statement or not.").

[43] Frank W. Bullock, Jr. & Steven Gardner, *Prior Consistent Statements and the Premotive Rule*, 24 FLA. ST. U. L. REV. 509, 514 (1997).

objected on this ground. And, by definition, a prior consistent statement inherently repeats evidence that has already been heard at trial. The rules of evidence distinguish between introducing the same evidence simply to bolster a witness's testimony (DRE 103), as opposed to the specific use of cumulative testimony to rebut a charge that the witness has a particular motive to lie on the stand (DRE 801(d)(1)(B)).[44] Here, the defense sought to admit the affidavit right after the prosecutor accused Cale of fabricating his story at trial because he no longer faced penal consequences and wanted to help his brother. The defense offered the affidavit to rebut that charge because Cale executed the affidavit six months before Cale accepted his plea when he still faced serious criminal consequences. The affidavit was also the only documentary evidence consistent with Cale's trial testimony. Under DRE 801(d)(1), the affidavit was cumulative, but admissible for purposes other than simply bolstering prior testimony.

---

[44] *See, e.g.*, *Tome v. United States*, 513 U.S. 150, 150 (finding that the analogous federal rule of evidence "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged fabrication, influence, or motive, conditions that were not established here"); *see also Guy v. State* 999 A.2d 863, 870 (Del. 2010) ("Cumulative evidence is '[a]dditional or corroborative evidence to the same point. That which goes to prove what has already been established by other evidence.' Here, defense counsel used the out-of-court statements for purposes different from the witnesses' actual testimony at trial. Although the State used the statements to prove the charges against Guy, defense counsel used the statements to undermine the credibility of the witnesses who gave those statements.") (citation omitted).

16

The Error Was Not Harmless Beyond A Reasonable Doubt

Where the Superior Court has erred in an evidentiary ruling, we must "weigh the significance of the error against the strength of the untainted evidence of guilt to determine whether the error may have affected judgment and determine whether the error constituted harmless error beyond a reasonable doubt."[45] We consider the entire record to determine the significance of the error.[46]

Although the State presented untainted evidence of Adams's guilt, the State's reliance in redirect examination and closing on inconsistencies between Cale's trial testimony and his prior statements outweighs the record evidence supporting guilt, and was prejudicial to Adams. The State's case against Adams relied heavily on the testimony of the individuals in the car. The jury had to make credibility determinations. After the Superior Court sustained the State's objection to the affidavit's admissibility, the State took advantage of the ruling and continued to press its theme that Cale had every reason to fabricate his trial testimony because he was no longer in jeopardy. The State insinuated in its resumed redirect examination that Cale was making up a story to assist his brother because he was no longer in jeopardy.[47] Adams was unable to counter this attack by introducing Cale's affidavit, executed at a time where he in fact faced penal jeopardy. Then, in

---

[45] *Edwards v. State*, 925 A.2d 1281, 1285 (Del. 2007) (quoting *Smith v. State,* 647 A.2d 1083, 1090-91 (Del.1994)).

[46] *Id.* at 597-98; *Van Arsdall v. State*, 524 A.2d 3, 10 (Del. 1987).

[47] Transcript of Trial at C21–22.

closing, Cale became the "main character" in the case, and the State once again focused its attention on the inconsistencies between Cale's trial testimony and prior statements.[48] Adams once again could not rely on the affidavit to counter this charge, as defense counsel promised he would do in his opening statement.[49]

If further corroboration was needed of the closeness of the case and the degree of prejudice resulting from the error, one need only look to the outcome of fellow co-defendant Morton's trial. The evidence and testimony at the two trials were similar, and in particular Cale's testimony at the two trials was similar.[50] The jury acquitted Morton of the firearms offenses.[51]

## IV. Conclusion

The Superior Court erred by not admitting Cale's affidavit into evidence, and the error was not harmless beyond a reasonable doubt. The judgment of the Superior Court is reversed, and the case is remanded to the Superior Court for proceedings not inconsistent with this opinion. Jurisdiction is not retained.

---

[48] *Id.* at C169-71; 174; 180-81.

[49] *Id.* at A38-39.

[50] *See Morton*, 2014 WL 7252046, at *1 ("Cale . . . told three different versions of how the firearms ended up under the seats of the SUV. Cale's first version was told to police during a recorded interview where Cale stated that the firearm under the driver's seat was his, but that he did not know how the other guns got into the SUV. After being informed that all three guns would be checked for DNA, Cale changed his story. He stated that all three guns were his, and that he had given the ten-millimeter Glock to Adams and the nine-millimeter Glock to Morton. At trial, Cale changed his story again. This time he denied giving the ten-millimeter Glock to Morton and testified that it was there prior to Morton getting in the car.").

[51] *Id.*