IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WAYNE WILLIAMS, | § | |
| | § | No. 195, 2015 |
| Defendant Below, | § | |
| Appellant, | § | |
| | § | Court Below: |
| v. | § | |
| | § | Superior Court of the |
| STATE OF DELAWARE, | § | State of Delaware |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | Cr. I.D. No. 1311002512 |

Submitted: April 13, 2016
Decided: June 2, 2016

Before **STRINE**, Chief Justice; **HOLLAND**, **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED in part**, **REVERSED in part**, **and REMANDED**.

Bernard J. O'Donnell, Esquire, Nicole M. Walker, Esquire (*Argued*), Office of Public Defender, Wilmington, Delaware for Appellant.

Andrew Vella, Esquire (*Argued*), Kathryn J. Garrison, Esquire, Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

In this direct appeal, we consider the constitutional boundaries of a trial court's discretion to limit the scope of a criminal defendant's cross-examination of the witnesses against him. Wayne Williams ("Williams") was indicted on two counts of Drug Dealing plus aggravating factors, one count of Tampering with Physical Evidence, one count of Resisting Arrest, and two counts of Possession of Drug Paraphernalia. The principal question presented on appeal is the extent to which Williams should have been permitted at trial to cross-examine witnesses concerning misconduct at the Office of the Chief Medical Examiner ("OCME")[1] and elicit testimony that presented an alternative explanation for the weight discrepancy involving the drug evidence in his case.

We conclude that there was no unconstitutional restriction of Williams' confrontation rights and that the Superior Court imposed reasonable limits when exercising its discretion to limit the scope of cross-examination. In view of the overwhelming evidence unrelated to the misconduct at the OCME, we hold that, even if the trial court had erred, the error would have been harmless beyond a reasonable doubt. Accordingly, but for the Tampering with Physical Evidence conviction which the State concedes must be reversed, we affirm Williams' convictions.[2]

---

[1] This Opinion refers to the OCME and the OCME's Controlled Substances Unit collectively as the "OCME."

[2] In the proceedings before this Court, the State agreed that Williams' Tampering with Physical Evidence conviction must be reversed in view of our holding in *Harris v. State*, 991 A.2d 1135 (Del. 2010). There, the defendant placed a plastic bag containing marijuana in his mouth in plain view of the police. Because the police "perceived and immediately retrieved the baggie," we reversed the defendant's conviction under 11 *Del. C.* § 1269, holding that the statute criminalizes the successful suppression of evidence. *Id.* at 1137-38. We observed that "Section 1269 does not apply to an attempted 'act of concealment, alteration or destruction,'" but instead "applies when the defendant 'suppresses' the evidence by actual completed concealment, alteration, or destruction." *Id.* at 1138 (emphasis removed). We agree with Williams and the State that the

1

## I.    FACTS

### A.    *Williams' Arrest*

On November 4, 2013, two members of the Governor's Task Force[3] were patrolling the parking lot of a Royal Farms in Blades, Delaware. While in an unmarked police vehicle, Sergeant Jason Stevenson ("Sergeant Stevenson") and Probation Officer William Wallace ("Officer Wallace") observed a maroon Suzuki Sidekick enter the lot, where it ultimately backed into a parking spot. The car's driver and passenger remained in the vehicle. When a marked patrol car entered the Royal Farms parking lot, the Suzuki pulled out before any of its occupants had exited the vehicle. Sergeant Stevenson and Officer Wallace followed the car, ultimately conducting a traffic stop after it made a left turn onto Middleford Road without using a turn signal.

After stopping the Suzuki, Sergeant Stevenson and Officer Wallace approached the vehicle. James Johnson ("Johnson") was in the driver's seat and Williams was in the passenger's seat. Sergeant Stevenson observed that Williams "was kind of fidgety in his seat" and was hesitant to make eye contact. After other members of the Governor's Task Force arrived, Sergeant Stevenson received consent from Johnson to search the Suzuki. Johnson exited the car, but Williams refused. Accompanied by other officers, Sergeant Stevenson removed Williams from the vehicle. During the struggle, Williams would not

---

facts of this case do not support the conclusion that the defendant actually concealed, altered, or destroyed evidence.
[3] The Governor's Task Force is composed of police officers and probation officers, who, among other things, patrol high-crime neighborhoods and perform checks on probationers.

remove his hands from his pockets. The officers forced Williams to the ground, with his arms pinned under him.

While on the ground, Williams put a plastic bag into his mouth. Sergeant Stevenson "began to choke" Williams, who then "spit" out the plastic bag. After lifting Williams off the ground, the officers discovered several bags of cocaine and marijuana and two cell phones where Williams had been laying. Officers at the traffic stop also found another bag of cocaine between the front passenger seat and center console of the Suzuki. During an interview with the police, Williams admitted that he attempted to sell marijuana in the parking lot and that he had sold drugs on multiple occasions earlier that day.

**B.** *The Simultaneously Proceeding OCME Investigation and the* **Irwin** *Guidelines*

During an unrelated January 2014 trial in Kent County Superior Court, it was discovered that drug evidence that had been in a sealed envelope stored at the OCME was missing, despite there being no appearance of tampering. As reported in a careful Opinion by the Superior Court in *State v. Irwin*[4] detailing the chronology and subsequent investigation of these events, the drugs in that case had been seized and replaced with blood pressure pills. An internal audit by the OCME failed to provide an explanation. When discrepancies were uncovered in additional cases, the Delaware State Police and Department of Justice initiated a criminal investigation resulting in the seizure of all evidence at the OCME and the suspension of all drug testing at that facility.

---

[4] 2014 WL 6734821 (Del. Super. Nov. 17, 2014).

The OCME investigation uncovered multiple issues relating to the storage of evidence, security at the lab, documentation of the evidence's arrival at and movement within the facility, and other failures in protocol.  These issues were documented in a 36-page report issued by the Attorney General's office on June 19, 2014.[5]  These events provide context for the chain of custody discussion which pertains to Williams' case, and they form the backdrop for various motions made by Williams before and during his trial.

## C.  *Chain of Custody of Williams' Drug Evidence*

After seizing the evidence from Williams on November 4, 2013, Detective Hudson Keller ("Detective Keller") placed the drugs in his patrol vehicle and transported them to Delaware State Police Troop 4.  On the same evening, Detective Scott Workman ("Detective Workman"), who received the evidence from Detective Keller, weighed, examined, and processed the drugs at Troop 4.  Detective Workman also performed

---

[5] Many officers put their lives in jeopardy enforcing our drug laws.  The unconscionable actions at the OCME have jeopardized numerous cases.  This misconduct is a breach of the public trust of the highest order and has resulted in an enormous expenditure of resources by all participants in the criminal justice system to address it.  Nothing in this Opinion should be construed as a criticism of any of the participants in this case—all of whom, from their various perspectives, have had the misfortune of dealing with the difficult and thorny issues arising out of the misconduct at the OCME.  Despite the egregious nature of the misconduct at the OCME, we have previously noted:

> There is no evidence to suggest that OCME employees tampered with drug evidence by adding known controlled substances to the evidence they received for testing in order to achieve positive results and secure convictions.  That is, there is no evidence that the OCME staff "planted" evidence to wrongly obtain convictions.  Rather, the employees who stole the evidence did so because it in fact consisted of illegal narcotics that they could resell or take for personal use.

*Brown v. State*, 108 A.3d 1201, 1204-05 (Del. 2015) (citation omitted); *see also Cannon v. State*, 127 A.3d 1164, 1168 (Del. 2015) (citing *Aricidiacono v. State*, 125 A.3d 677 (Del. 2015) (no evidence of tampering)) (citations omitted).

"field tests" on the evidence and determined that the police had seized 6.6 grams of cocaine and 17.7 grams of marijuana from Williams.

After weighing and field testing the drugs, Detective Workman prepared two separate evidence envelopes for the cocaine and marijuana. The outside of the envelopes identified the complaint number assigned to the evidence, the type and weight of the drugs, and indicated that the drugs were seized from Williams and were kept within plastic baggies. In addition to the date and time the drugs were seized, the envelopes also reflected that Detective Keller collected the evidence and transported it to Troop 4. Detective Workman, after placing the cocaine and marijuana in their respective containers, sealed the evidence envelopes. At trial, when asked to explain the manner in which the evidence envelopes were sealed, Detective Workman testified that "the envelopes are glued. They have glue. And when you press them down, they adhere to the back of it, but it also has the blue evidence tape that we -- when everything is done, we seal the seam that connects the top and the bottom of the evidence envelope."[6]

Between November 4 and 6, 2013, Williams' drug evidence was stored at Troop 4. Detective Michael Maher ("Detective Maher") testified that, on November 6 at 12:15 p.m., a courier employed by the OCME, James Daneshgar ("Daneshgar"), retrieved the evidence from Troop 4. When Detective Maher removed the drugs from Troop 4's temporary evidence locker, the envelopes were sealed.[7] An evidence tracking worksheet

---

[6] B37.

[7] On cross-examination, Detective Maher testified that he functioned as a "custodian" for the drugs while they were at Troop 4, and that he did not open the evidence envelopes to determine their contents at any point prior to Daneshgar retrieving them. A259; *see also* Transcript of Trial

5

also reflected that Daneshgar picked the evidence up from Troop 4 on November 6. However, the chain of custody report with respect to the evidence (the "Chain of Custody Report") indicates that Daneshgar retrieved the drugs from Detective Maher on November 7, 2013 at 1:41:31 p.m. The Chain of Custody Report also indicates that the evidence was placed in the evidence locker at the OCME on that date and time.[8] Daneshgar testified that the Chain of Custody Report is incorrect, and acknowledged that November 7 is the date on which "the case was logged into the database," not the date on which he retrieved the evidence from Detective Maher at Troop 4.[9]

Nevertheless, according to the Chain of Custody Report, the drugs seized from Williams remained in the OCME evidence locker from November 7, 2013 until March 4, 2014. In February 2014, the Delaware State Police and the Department of Justice initiated their investigation into criminal misconduct at the OCME.[10] Because the investigation revealed that some drug evidence sent to the OCME for testing had been stolen by OCME employees in some cases and was unaccounted for in others, the Delaware State Police removed evidence from the OCME (the "DSP Audit").

at A-168-69, *State v. Williams*, Cr. ID. No. 1311002512 (Del. Super. Jan. 13, 2015) ("I turn [the envelope] over to make sure it's completely sealed and there is a piece of tape across it that's also initialed. If there was an issue with it, I would be getting up with the officer to have him fix that issue before it would go up to [the OCME]."). Further, on cross-examination, Daneshgar testified that, before leaving Troop 4, he examined the evidence envelopes for any discrepancies or issues. Transcript of Trial at A-190, *State v. Williams*, Cr. ID. No. 1311002512 (Del. Super. Jan. 13, 2015)

[8] Daneshgar testified that, upon arriving at the OCME, he would place evidence "in the drug vault overnight until [he] had a chance to log the case in." A268.

[9] A271.

[10] *Brown*, 108 A.3d at 1204.

## 1.    *The DSP Audit*

On March 4, 2014, the evidence in Williams' case was removed from the OCME vault and transported to the Delaware State Police vault at Troop 2. The Chain of Custody Report indicates that Daneshgar removed the evidence from the OCME vault and placed it in storage with the Delaware State Police. On cross-examination, Daneshgar testified that this portion of the Chain of Custody Report is also incorrect. Daneshgar was not responsible for removing the evidence from the OCME vault on March 4, 2014. In fact, on March 4, Sergeant Scott McCarthy ("Sergeant McCarthy") and two other officers were responsible for transporting the evidence from the OCME to Troop 2, where it was "entered into [a] drug evidence center."[11] Daneshgar's role in the removal process was merely to log evidence out of the OCME computer system.

In connection with the investigation of misconduct at the OCME, an "audit" was performed on drugs stored there. Between 1:57 p.m. and 2:01 p.m. on March 6, 2014, the evidence seized from Williams was audited by Detective Vincent Jordan ("Detective Jordan"). The one-page audit report reflects that there was no "discrepancy" between the contents of the evidence containers and the description of the evidence on the outside of the containers.[12] At trial, Detective Jordan was unable to recall whether the evidence was

---

[11] On cross-examination, defense counsel asked Sergeant McCarthy whether he had ever opened the evidence envelopes, and Sergeant McCarthy testified that he "did not." Transcript of Trial at B-51, *State v. Williams*, Cr. ID. No. 1311002512 (Del. Super. Jan. 14, 2015).

[12] The audit report does not describe the manner in which the audit was conducted. Nor does it describe the condition of the envelopes containing the evidence, the evidence tape, or the evidence itself.

7

merely counted during the audit or whether the baggies containing the drugs were weighed.

## 2. *Testing at NMS Labs*

On April 10, 2014, Detective Scott Kleckner ("Detective Kleckner") transported the evidence seized from Williams to NMS Labs ("NMS") for testing.[13] Sally Tokarz ("Tokarz") was the NMS chemist responsible for analyzing the drugs.[14] She testified that, upon her initial examination of the evidence, the drugs in one of the envelopes were contained in "six clear plastic bags" that "were all sealed by knotting."[15] As to evidence in the second envelope, Tokarz testified that it too was contained in "six clear plastic bags," "five of which were sealed by knotting."[16]

Tokarz testified that she examined the evidence envelopes to determine whether the packaging was completely sealed prior to analyzing the substances contained in the plastic bags. She concluded that the containers had holes large enough to "kind of start your finger in . . . ."[17] That is, Tokarz testified that the envelopes were only partially

---

[13] Detective Kleckner testified that he "never opened or accessed" the evidence envelopes prior to transporting them to NMS, but rather that he placed such envelopes "into a box" that was "sealed," "taped" and "initialed." B56.

[14] NMS Labs, located in Willow Grove, Pennsylvania, was the independent lab used by the State after the OCME facility was closed.

[15] B64.

[16] *Id.* The NMS report describes the envelope that contained the cocaine as follows: "One sealed manila envelope . . . containing one clear plastic ziplocked bag containing six clear plastic bags sealed by knotting containing white solid material." A151. As to the envelope that contained the marijuana, the NMS report describes the envelope as follows: "One sealed manila envelope . . . containing one clear plastic ziplocked bag containing six clear plastic bags (five of which are sealed by knotting) containing botanical material." *Id.*

[17] B67; *see also* A308.

sealed with evidence tape.[18]  Because the NMS chemist nonetheless determined that the seals on the evidence envelopes were "completely intact," that the evidence tape "had not been tampered with at all," and that the evidence itself had not been tampered with, she proceeded to analyze the drugs seized from Williams.[19]

In her analysis, Tokarz concluded that the substances seized from Williams were cocaine and marijuana.  She also testified that she weighed the drugs separately from the plastic bags in which they were contained.  When doing so, Tokarz observed that the weight of the cocaine was 4.10 grams—approximately 2.5 grams less than what the police claimed to have seized from Williams on November 4, 2013.  She further reported that the marijuana weighed 14.35 grams—3.35 grams less than what the police claimed to have seized from Williams.  With respect to the discrepancies in the weight of the cocaine and marijuana (collectively, the "Weight Discrepancies"), Tokarz acknowledged that, in both instances, the decrease was significant.  At trial, Tokarz testified that she would attribute the Weight Discrepancies to the fact that the drugs were weighed outside of the plastic bags in which they were contained.

On June 5, 2014, Detective Kleckner retrieved the evidence from NMS and transported it to Troop 2.[20]  On July 16, 2014, Detective William Marvel retrieved the

---

[18] A305 ("[T]here was evidence tape, but it didn't cover all of the opening of the envelope.  So in my opinion I felt that that was not sealed because all of the envelope was not covered with the evidence tape."); *see also id.* ("The seals were completely intact.  It was just that in my opinion I would have wanted evidence tape along the entire opening of the envelope for it being [*sic*] sealed properly.").

[19] B66-67.

[20] At trial, Detective Kleckner testified that he would not have opened the evidence after it was tested at NMS.

evidence from Troop 2 and transported it to Troop 4, "where it was placed in the permanent evidence locker."[21]

### D.    *Williams' Motions* in Limine

On June 25, 2014, Williams filed a motion to exclude the drug evidence, challenging its reliability. Williams also filed a motion *in limine*, dated July 2, 2014, requesting that he be permitted to cross-examine the witnesses presented at trial about the OCME investigation. The Superior Court denied both motions.

As to the motion *in limine*, the court reasoned that the circumstances surrounding the OCME investigation were irrelevant because the evidence envelopes were "never opened" at the OCME and the drugs were not tested at the OCME.[22] The trial court also based its ruling on the premise that the "envelope was of good integrity."[23] According to the Superior Court, "[t]here was no opportunity[,] if the evidence was not opened[,] to take out, replace, substitute or in some way contaminate the contents of the envelope."[24] The court, therefore, concluded that it was "satisfied from the facts of this particular case that the circumstances surrounding all of the investigation in the [OCME were] irrelevant" and that it would "not allow the evidence about the [OCME] investigation."[25]

---

[21] When asked whether he "would have opened" the package containing the evidence, Detective Marvel testified that he would not have.

[22] *See, e.g.*, Op. Br. Ex. A at A34.

[23] Op. Br. Ex. A. at A38. During a January 12, 2015 office conference, the Superior Court stated that, "[i]f there's no testimony that that envelope was opened while that envelope was sitting in a safe at the [OCME], [it was] not going to allow any testimony about what happened up there, all the investigation." A173. Further, at the office conference, the court observed: "If there was discrepancy in weight and the envelope had been opened, it would be relevant. If this envelope has not been opened, it is not relevant." *Id.*

[24] Op. Br. Ex. A. at A34-35.

[25] *Id.* at A35.

Further, the trial court stated that "there is no reason for anyone to raise an issue that causes the jury to speculate. The issue before them is[] what did this defendant do and what did he do it with[,] and nothing about the [OCME] investigation is relevant to those two questions."[26]

### E. *Prior to Williams' Trial, the* **Irwin** *Decision Issues*

Prior to the commencement of Williams' trial, the Superior Court, in *Irwin*, established a general framework for addressing cases that were awaiting trial and implicated the misconduct at the OCME. Although *Irwin* is not binding upon this Court, the Opinion has provided useful guidance to litigants attempting to navigate the issues presented by the misconduct of former OCME employees, particularly in the context of defendants' challenges to the State's ability to introduce drug evidence at trial. *Irwin*'s guidance was developed after extensive hearings and testimony concerning the misconduct at the OCME. Further, the Superior Court reviewed cases involving crime labs that experienced scandals similar to those at the OCME from the courts of West Virginia, Massachusetts, Texas, Florida, New York, North Carolina, and California.

### 1. *The* Irwin *Guidelines Concerning the DSP Audit*

As to the DSP Audit, the *Irwin* Court observed that "there was no written direction or protocol, and the determination of whether there was a discrepancy was in large part left to the discretion of the reviewing officers."[27] The Superior Court ruled that, by handling evidence, the auditing officers became part of the chain of custody. But *Irwin*

---

[26] *Id.* at A37.
[27] *Irwin*, 2014 WL 6734821, at *6.

cautioned that the audit-related "conclusions" of Delaware State Police officers, "if presented at trial, would perhaps unfairly influence the jury's determination of the reliability of that evidence."[28]  Accordingly, the *Irwin* Court concluded that the officers' "finding of 'no discrepancy' is not conclusive of anything and certainly has no evidentiary value."[29]  *Irwin* held that, "in drug cases that went to the OCME drug lab and were part of the audit process, the [Superior] Court believes it would be inappropriate to allow counsel to solicit from the auditing officers in their case in chief any indication as to their findings."[30]  The Superior Court even urged counsel to "stipulate that during the transfer of the drugs to Troop 2, following the shutdown of the OCME drug lab, that additional officers assisted in the transfer but the parties have agreed they are not required to testify regarding their handling of the evidence."[31]  The court stated that if for reasons "unfathomable" to the Superior Court counsel wished to explore the DSP Audit process and solicit from the auditing officers any indication as to their findings, "the State then may request permission to rebut any improper suggestions made by counsel's questions."[32]

### 2.    *Permissible Inquiry into the OCME Investigation*

The *Irwin* Court also addressed the extent to which "the parties may question the witnesses or present evidence regarding the investigation of the OCME drug lab during

---

[28] *Id.* at *11.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*

12

the trial."[33]  It observed that "the benefit of that testimony will depend upon the unique facts of each case and the litigation strategy of counsel."[34]  The Superior Court attempted to strike a reasonable balance in drug-related cases involving weight discrepancies by establishing a "bright line" that need be crossed before questioning concerning the OCME investigation would be permissible.  It held that:

> [I]f a case was sent to the OCME drug lab for testing, the defense will be free to question the State's witnesses or to present evidence regarding the OCME investigation only if there is either evidence of tampering of the packaging submitted by the police or a discrepancy in weight, volume or contents from that described by the seizing officer.  If evidence of tampering is not present and there is no discrepancy, the OCME investigation is not relevant under Delaware Rule of Evidence 402 or at least would be misleading and unfair under Rule 403.  In such cases, therefore, evidence of the investigation should not be introduced.[35]

Discrepancies in weight are common.  Given the multitude of factors implicated by the misconduct at the OCME, the *Irwin* Court declined to create definitive lines regarding the admissibility of the OCME investigation specific to each type of drug.  The *Irwin* Court recognized that its standard regarding the admissibility of the OCME investigation would "undoubtedly lead to the . . . door being opened to defense counsel in more cases than perhaps appropriate," but that "the reasonable safeguard here is not in whether it is admissible but the extent it is admitted."[36]  It concluded by stating that "the universe of these cases remaining to be tried is not significant" and emphasized that "fairness dictates that there be some leeway given to strike a reasonable balancing of the

---

[33] *Id.* at *12.
[34] *Id.*
[35] *Id.*  Here, it is undisputed that the drugs in Williams' case were not tested at the OCME.
[36] *Id.*

explanations given to the jury so that they may weigh the evidence and determine whether they are convinced that the drug evidence offered at trial is that which was seized by the police from the defendant."[37]

### F.      *Williams' Pre-Trial Proceedings*

On November 17, 2014, the Superior Court issued its decision in *Irwin*.  It is evident from our independent review of the record in Williams' case that the court was staying abreast of developments in *Irwin* and their potential implications in Williams' case.  On April 11, 2014, the Superior Court held an office conference regarding the State's request for a continuance in Williams' case due to the misconduct at the OCME.  The State presented initial information flowing from the investigation of the OCME and the State's attempts to acquire a second laboratory for evidence testing.  Over Williams' objection, the Superior Court granted the State's request for a continuance.

On June 18, 2014, at a case review in this matter, the Superior Court directed the State to examine the envelopes containing Williams' drug evidence and report back as to whether any white OCME evidence tape was placed on them.[38]  That day, at the request of the State, Sergeant McCarthy removed the containers from the Troop 2 evidence locker and examined the packaging.  In a written letter to the Superior Court following Sergeant McCarthy's inspection of the containers, the State reported that there was no white OCME evidence tape on the envelopes.[39]

---

[37] *Id.* at *13.
[38] White evidence tape was used by the OCME to seal packaging.  The Delaware State Police used dark blue evidence tape.
[39] B49.

14

On January 12, 2015, prior to trial, the Superior Court held an office conference.[40] During the conference, well aware of the developments in *Irwin*, the court discussed with counsel whether the evidence envelopes had been opened at the OCME and whether there was a discrepancy in the weight of the drugs. After defense counsel represented to the trial court that he had not examined the evidence,[41] he declined the Superior Court's offer to have an expert examine it. The court concluded that, unless it was established that the envelopes related to the drug evidence had been opened at the OCME, the investigation into misconduct at the OCME was not relevant to Williams' case.[42] The Superior Court then ordered defense counsel to examine the evidence containers,[43] indicating that he should report back to the court if he had any questions regarding the integrity of the envelopes. There is no evidence in the record before this Court that defense counsel informed the trial court of any such questions subsequent to the ordered examination of the evidence containers. In fact, the transcript of the proceedings immediately prior to trial on January 13, 2015 indicates that defense counsel, after being directed to do so at the office conference on the preceding day, reviewed the evidence

---

[40] The transcript of the January 12, 2015 office conference further reflects the Superior Court's careful consideration of the *Irwin* guidelines and the court's commitment to applying them consistently in Williams' case. *See, e.g.*, A176-77 (discussing that *Irwin*'s guidelines are not implicated in "a case where there's no action on the part of the OCME with regard to the drugs except to receive them").

[41] Defense counsel said, "I was offered to look at the evidence bag. I declined." A178.

[42] The court stated that, "[i]f there was discrepancy in weight and the envelope had been opened, it would be relevant. If this envelope has not been opened, it is not relevant." A173. It further observed that, "if [the] OCME didn't have [the evidence] envelope open while it was there, not a thing about the investigation at [the] OCME comes in." A174.

[43] Defense counsel responded, "[n]ow that you are ordering me to, that is fine." A178.

15

envelopes in this case and did not subsequently raise concerns about their integrity with the Superior Court.[44]

## G.     *Williams' Trial*

Williams' trial began on January 13, 2015.  On the first day of trial, the State presented the testimony of Sergeant Stevenson and Detectives Keller, Workman, and Maher, among others.  In addition, the State presented the testimony of Daneshgar.  Defense counsel was permitted to cross-examine each of the witnesses the State presented.  The scope of defense counsel's cross-examination included, but was not limited to, the various errors contained in the Chain of Custody Report and each individual's handling of the evidence.

Prior to Williams' trial, the *Irwin* Court had urged counsel in matters implicating the misconduct at the OCME to stipulate that, "during the transfer of the drugs to Troop 2, following the shutdown of the OCME drug lab, that additional officers assisted in the transfer[,] but the parties have agreed they are not required to testify regarding their handling of the evidence."[45]  In this case, the State attempted to stipulate to the DSP Audit team's handling of Williams' drug evidence.[46]  But defense counsel was unwilling

---

[44] *See* B25 (Superior Court: "I am satisfied that based on the record in this case -- and I assume you went to see --" Defense Counsel:  "I did.").  Accordingly, the Superior Court observed that it "revisited" the *Irwin* decision and that, in view of "the anticipated evidence being that the envelope was never opened at the [OCME] in Wilmington and the drugs were tested somewhere else," it was "satisfied from the facts of this particular case that the circumstances surrounding all of the investigation in[to] the [OCME were] irrelevant . . . ."  B25-26.

[45] *Irwin*, 2014 WL 6734821, at *11.  The Superior Court reasoned that stipulating as to this fact "would alleviate the issue and any potential unfair weight the jury may give to an unsolicited comment during the auditing officers' testimony."  *Id.*

[46] Transcript of Trial at B-6, *State v. Williams*, Cr. ID. No. 1311002512 (Del. Super. Jan. 14, 2015).

16

to stipulate to the audit and, in order to establish the chain of custody, the State subpoenaed each of the members of the audit team, including Detective Jordan.[47]

On January 14, 2015, the second day of Williams' trial, the State presented the testimony of Sergeant McCarthy and Detective Jordan, among others. Sergeant McCarthy testified as to the processes followed by the Delaware State Police when removing evidence from the OCME. Detective Jordan testified regarding his participation in the DSP Audit of the evidence in Williams' case. On direct examination, Detective Jordan stated, with respect to the evidence envelopes, that he opened and resealed them using Delaware State Police dark blue evidence tape. He also testified that the evidence was open for approximately four minutes during the audit. In response to a question from the prosecutor, Detective Jordan testified that there was no discrepancy in the evidence. Thereafter, defense counsel cross-examined Detective Jordan regarding the DSP Audit, inquiring as to the procedures followed during the review of the evidence in Williams' case, the integrity of the envelopes, and the means by which he reached the conclusion that there was no discrepancy between the contents of the containers and their description.

The State introduced additional testimony concerning the integrity of the evidence envelopes through Tokarz, who testified that she examined the containers prior to testing the drugs, concluding that "[t]he seals were completely intact."[48] As previously discussed, she also testified on direct examination that the envelopes had holes large

---

[47] *Id.*
[48] A305.

enough to "kind of start your finger in . . . ."[49] On cross-examination, Tokarz stated that the holes were large enough to insert her finger into them, but that she did not raise that concern with the Delaware State Police because she in fact "couldn't get [her] finger in."[50] Tokarz clarified on redirect that, despite the holes in the envelopes where the evidence tape partially sealed the packaging, she ensured that "the evidence tape had not been in any way tampered with or altered."[51]

During the testimony of the State's final witness, defense counsel moved for the Superior Court to rule as a matter of law that the State had failed to establish the chain of custody.[52] The court denied the motion, reasoning that it was "satisfied that the testimony of the individuals who actually handled the evidence, from the officer who collected it at the scene, to the officer who documented and inventoried it and put it in the bags, to the transport to the OCME, to the transport to Troop 2, to the transport to NMS and back to Troop 2, and then to Troop 4 and then to court today," established the chain of custody "with sufficient integrity" to render the evidence admissible.[53]

After both parties rested, the defense moved for judgment of acquittal. The Superior Court denied Williams' motion with respect to the Drug Dealing charges, but dismissed both counts of Possession of Drug Paraphernalia.

---

[49] B67; *see also* A308.
[50] *Id.*
[51] B74; *see also* A309 (Q. "You simply made note of the fact that the evidence tape did not completely go from one edge to the other edge?" A. "That is correct.").
[52] Transcript of Trial at B-231, *State v. Williams*, Cr. ID. No. 1311002512 (Del. Super. Jan. 14, 2015).
[53] *Id.* at B-233.

On January 15, 2015, the State and defense counsel made closing statements. As part of its closing, the State attempted to highlight for the jury that it had established the chain of custody and had addressed any inconsistencies with respect to the Chain of Custody Report. Further, during its closing argument, the State argued to the jury that it had established that the evidence in this case had not been tampered with and that the discrepancy in the weight of the drugs was due to the bags in which they were contained.

On January 15, 2015, the jury found Williams guilty of Drug Dealing and Possession of Cocaine as the lesser included offense of Drug Dealing.[54] The jury also found Williams guilty of Tampering with Physical Evidence, but acquitted Williams of Resisting Arrest. Prior to sentencing, the State moved to declare Williams a habitual offender. The Superior Court granted the State's motion and sentenced Williams as a habitual offender under 11 *Del. C.* § 4214(a). Williams was sentenced to eight years at Level V for the Drug Dealing charge, four years at Level V for the Tampering with Physical Evidence charge, and one year at Level V suspended for one year of Level III supervision for the Possession of Cocaine charge.

## II.    ANALYSIS

On appeal, Williams argues that his right to confront the witnesses against him under the Sixth Amendment to the United States Constitution and Article I, § 7 of the

---

[54] As to both the Drug Dealing and Possession of Cocaine as the lesser included offense of Drug Dealing convictions, the jury found the aggravating factor that the charges occurred within a vehicle.

19

Delaware Constitution was unconstitutionally infringed.[55]   He contends that information

with respect to the misconduct at the OCME was relevant to the jury's decision as to the

---

[55] On appeal, Williams also argues that the State improperly exercised a peremptory challenge against an African-American venireman, Richard Johnson, and that the trial court abused its discretion by failing to declare a mistrial. We reject this argument, and affirm the trial court's ruling under *Batson v. Kentucky*, 476 U.S. 79 (1986). Williams' jury pool consisted of 86 prospective jurors. Four were African-American. The Superior Court struck one of the African-American prospective jurors because she was the sister of a police officer witness in this matter, Detective Anthony Andrews. That left three African-American prospective jurors: Verlon Peters, Richard Johnson, and "M.P." The State used four peremptory challenges to strike three jurors and one alternate juror. The State struck venireman Johnson, who was a retired correctional officer, and venireman Peters, who had a prior assault conviction. A208. M.P. served on Williams' jury. After the jury panel had been selected but before they were sworn, the defense requested that the State give race neutral reasons for its use of peremptory strikes on veniremen Johnson and Peters. On appeal, Williams does not press his challenge to the State's strike of venireman Peters.

The trial court made no specific finding as to whether Williams made out a *prima facie* case of discrimination. The Superior Court simply called for the State's response to defense counsel's request that the State give race neutral reasons for its strikes of veniremen Johnson and Peters. We observe that under the circumstances of this jury pool, and with few statistics to guide us, it is not clear that a *prima facie* case was established. *See, e.g.*, *Sells v. State*, 109 A.3d 568, 580 (Del. 2015) (holding, in the context of a reverse-*Batson* claim, that it is the opponent of the strike's burden to set forth facts and other relevant circumstances to support an inference of discrimination). Nonetheless, when proferring a race neutral explanation for peremptorily striking venireman Johnson, the prosecutor argued that venireman Johnson "was a retired correctional officer and the State did not believe he would be appropriate. He may have rehabilitative duties as a correctional officer." A208. Further, the prosecutor incorrectly asserted that venireman Johnson had failed to disclose his previous employment as a correctional officer when the trial court purportedly directed individuals involved in law enforcement to come forward. In fact, the Superior Court issued no such instruction to the prospective jurors in Williams' case. Despite the prosecutor's misstatement, we do not find error in the trial court's conclusion that the reasons proffered by the State were race neutral. Notably, the trial court excused the two other corrections officers in the venire that came forward during *voir dire*, both of whom expressed biases in favor of law enforcement. *See* A200-04.

The trial court did not rule on Williams' *Batson* claim until immediately before the jury issued its verdict. In ruling, the trial court never expressly stated that it was engaging in the third step of *Batson*'s analysis. *See Foster v. Chatman*, 2016 WL 2945233, at *8-9 (May 23, 2016) (addressing the third step of the *Batson* analysis wherein the trial court must determine whether the defendant has shown purposeful discrimination). Here, the Superior Court invited Williams to respond to the State's race neutral explanations for striking venireman Johnson. The entirety of defense counsel's argument as to venireman Johnson was as follows: "Well, Your Honor, there were correctional officers, I can't recall whether there were correctional officers that approached the bench or not, but frequently we have correctional officers that are on the panel

weight to be given to the evidence against him.  In particular, Williams urges that he should have been allowed to present evidence of the misconduct at the OCME as a possible explanation for the Weight Discrepancies.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion.[56]  This Court reviews claims of constitutional violations *de novo*.[57]  We also apply *de novo* review to the Superior Court's legal conclusions.[58]  "We review the Superior Court's factual findings to determine 'whether there was sufficient evidence to support the findings and whether those findings were clearly erroneous.'"[59]

### A.    *Williams' Right to Confrontation Was Not Violated*

Both the Delaware and United States Constitutions guarantee the right of a defendant to confront the witnesses against him.[60]  A certain threshold level of cross-examination is thus constitutionally required, and the discretion of the trial judge may not

---

and get selected for jury duty.  I don't find that is a legitimate reason to strike or a fair reason to strike that particular individual."  A208.

Although the manner in which the trial court addressed Williams' *Batson* claim was not ideal—that is, by omitting to set forth express factual findings for each step and waiting until after closing arguments to address the contention—we find no reversible error here.  We caution, however, that trial judges should carefully articulate specific reasons for each finding on the record when performing the *Batson* analysis, including whether a *prima facie* case has been established, whether a neutral explanation has been given, and whether the totality of the circumstances support a finding of purposeful discrimination.

[56] *Brown v. State*, 117 A.3d 568, 578-79 (Del. 2015) (citing *McNair v. State*, 990 A.2d 398, 401 (Del. 2010)) (citation omitted).

[57] *Wheeler v. State*, 2016 WL 825395, at *11 (Del. Mar. 2, 2016) (citations omitted).

[58] *Loper v. State*, 8 A.3d 1169, 1172 (Del. 2010) (citing *Sierra v. State*, 958 A.2d 825, 828 (Del. 2008)).

[59] *Bradley v. State*, 51 A.3d 423, 433 (Del. 2012) (quoting *Lopez-Vazquez v. State*, 956 A.2d 1280, 1285 (Del. 2008)).

[60] *Weber v. State*, 457 A.2d 674, 682 (Del. 1983) (citing U.S. Const. amend. VI; Del. Const. art. I, § 7).

be unreasonably imposed to defeat it.[61]  Although the United States and Delaware Constitutions guarantee a defendant the right to cross-examine the witnesses against him, the scope of such right is not unbounded.[62]

The Confrontation Clause's guarantee is the "*opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[63]  Indeed, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[64]

Under Delaware law, an exercise of a trial court's discretion to limit the scope of cross-examination permitted to a defendant should be guided by the criteria set forth by this Court in *Snowden v. State*[65] and *Weber v. State*.[66]  Those factors include:  (1) whether the testimony of the witness being impeached is crucial; (2) the logical relevance of the specific impeachment evidence; (3) the danger of unfair prejudice, confusion of the

---

[61] *Id.* (citing *Greene v. Wainwright*, 634 F.2d 272 (5th Cir. 1981)) (citations omitted).

[62] *See Wilkerson v. State*, 953 A.2d 152, 156 (Del. 2008) ("[T]he right of cross[-]examination is not unlimited and trial judges are permitted to impose reasonable boundaries on the scope of cross[-]examination." (citations omitted)); *see also Crane v. Kentucky*, 476 U.S. 683, 689 (1986) ("[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" (alterations in original)) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

[63] *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (*per curiam*) (citation omitted) (emphasis in original).

[64] *Van Arsdall*, 475 U.S. at 679.

[65] 672 A.2d 1017 (Del. 1996).

[66] 457 A.2d 674 (Del. 1983).

22

issues, and undue delay; and (4) whether the evidence is cumulative.[67]  Where, as here, cross-examination relates to impeachment evidence, "the test for determining if the trial judge's limitation on cross-examination violated the defendant's confrontation right is whether the jury had in its possession sufficient information to appraise" the biases, credibility, or motives of the witness.[68]

In reaching the conclusion to limit the admissibility of the misconduct at the OCME, the record reflects that the trial judge in Williams' case carefully considered the relevance of the impeachment evidence to be offered by the defense and the danger that the jury may confuse the issues presented.  Williams sought to show, through cross-examination of the State's witnesses, that the reliability of the drug evidence against him may have been affected by its presence at the OCME from November 7, 2013 until March 4, 2014.  The Superior Court based its decision to exclude testimony concerning misconduct at the OCME on the premises that the evidence was "never opened" at the lab and that the "envelope was of good integrity."[69]  Moreover, the court concluded that "[t]here was no opportunity[,] if the evidence was not opened[,] to take out, replace, substitute or in some way contaminate the contents of the envelope."[70]  Finally, prior to trial, the Superior Court stated with respect to the OCME investigation that "there is no reason for anyone to raise an issue that causes the jury to speculate."[71]

---

[67] *See Snowden*, 672 A.2d at 1025; *Weber*, 457 A.2d at 681.
[68] *Weber*, 457 A.2d at 682.
[69] Op. Br. Ex. A. at A38.
[70] *Id.* at A34-35.
[71] *Id.* at A37.

The Superior Court's conclusion that the containers were not opened at the OCME is supported by the record evidence. Nonetheless, the court permitted cross-examination regarding whether the containers had been tampered with, the Weight Discrepancies, and whether the envelopes had been opened at the OCME.[72] Defense counsel was also permitted the opportunity to probe the errors in the Chain of Custody Report through cross-examination. The trial court, in this case, imposed reasonable boundaries on the scope of cross-examination to protect against speculation and confusion of the issues among the jurors.

The trial court did not abuse its discretion by limiting questioning with respect to the misconduct at the OCME and whether that misconduct was an alternative explanation for the Weight Discrepancies. It made the logical decision that if there was no evidence that the envelopes had been opened at the OCME, raising that subject would invite the jurors to speculate. Ultimately, the Superior Court properly attempted to avoid collateral issues related to misconduct at the OCME that could have confused the jury. Thus, we conclude that the jury possessed sufficient information to evaluate the testimony of the

---

[72] *See, e.g.*, B53 (Q. "Detective, subsequent to the time that we've been talking about, specifically in June of 2014, did there come a time when you went to examine the packages again?" A. "I believe on June 18th a request was made to do a visual examination of the evidence to determine whether or not there was any tape from the medical examiner's office on there." Q. "That would have been white tape?" A. "That's correct." Q. "And was there white tape on there?" A. "No, I didn't observe any."); B76 (Q. "You just testified that you would attribute the difference in weight to the bags?" A. "I would." Q. "But you didn't weigh the bags?" A. "I did not, no.").

State's witnesses, and that Williams' challenges under the Federal and State Confrontation Clauses are without merit.[73]

### B. *Even if the Superior Court Erred, Such Error Was Harmless Beyond a Reasonable Doubt*

Even if precluding Williams from cross-examining the State's witnesses concerning the misconduct at the OCME constituted error of a constitutional dimension, "a reversal is required only if the reviewing court cannot conclude that the error was harmless beyond a reasonable doubt."[74] In applying the harmless error test in the context of alleged constitutional error, the factors we must consider are: "(1) the importance of the testimony of the challenged witness; (2) whether his [or her] testimony was cumulative; and (3) the presence or absence of overwhelming evidence of guilt."[75] The task of the reviewing court is to "consider[] the probability that an error affected the jury's decision."[76] "Ultimately, the Court must weigh the significance of the error against the strength of the untainted evidence of guilt to determine whether the error" may have affected the judgment.[77]

In the instant matter, any error may be deemed harmless because it occurred in a trial involving non-weight-based crimes in which the prosecution presented

---

[73] We are of the opinion that the same result is reached in this case under the Federal and State Constitutions.

[74] *Wilson v. State*, 950 A.2d 634, 639 (Del. 2008) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). Williams has not claimed that the error raised here is a structural constitutional defect. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-49 (2006) (discussing distinction between "trial errors" which are subject to harmless error review and "structural defects" which are not).

[75] *Wilson*, 950 A.2d at 639 (citing *Van Arsdall v. State*, 524 A.2d 3, 8 (Del. 1987) [hereinafter, "*Van Arsdall II*, 524 A.2d at __"]).

[76] *Van Arsdall II*, 524 A.2d at 9-10.

[77] *Id.* at 11 (citation omitted).

overwhelming other evidence of guilt unrelated to the misconduct at the OCME and the chain of custody.[78] In a recorded interview with the police, Williams admitted that, on the day of his arrest, he was in possession of marijuana and cocaine. Williams also admitted in the interview that he intended to sell marijuana in the Royal Farms parking lot on November 4, 2013 and that he, in fact, sold drugs on multiple occasions earlier that day. Williams' admissions were played for the jury. In addition to the defendant's admissions, the jury also heard testimony that Williams, after the police struggled to remove him from the Suzuki, attempted to ingest the evidence while it remained in a plastic bag. After being restrained by the police, Williams eventually "spit" out the evidence and the officers collected it. Finally, when the officers lifted Williams off the ground and took him into custody, they found two cell phones. Taken together with his admissions, this physical evidence satisfies us that a revelation to the jury concerning the misconduct at the OCME would not have affected the jury's view of the strength of the prosecution's case against Williams as a whole.

### III. CONCLUSION

Williams' right to confrontation was not violated. Even if there had been such a violation, there was overwhelming evidence sufficient to conclude that any constitutional error was harmless beyond a reasonable doubt.[79] The convictions are AFFIRMED as to

---

[78] *See id.* at 12 (holding that an error "may yet be deemed harmless if it occurs in a trial in which the prosecution presented 'overwhelming' untainted evidence of guilt").

[79] *See Van Arsdall*, 475 U.S. at 681; *see also Brown*, 117 A.3d at 570 (noting that "any sloppiness or other improprieties at [the] OCME" did not result in any "injustice" to the defendant, where he admitted to possessing cocaine and there was "overwhelming evidence of his guilt separate from the drugs seized from him").

all issues but for the Tampering with Physical Evidence charge.  Accordingly, the case is REMANDED for re-sentencing, as Williams' sentence was based, in part, upon the Tampering with Physical Evidence conviction, which the State concedes must be REVERSED.