IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PIERRE DOWNS, | § | |
| | § | |
| Defendant Below, | § | No. 220, 2018 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | |
| | § | Cr. ID. K1610003784A&B |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: January 9, 2018
Decided: March 4, 2019

Before **VALIHURA**, **SEITZ**, and **TRAYNOR**, Justices.

## **O R D E R**

This 4th day of March 2019, after careful consideration of the parties' briefs and the record on appeal, it appears to the Court that:

(1)    Pierre Downs appeals his convictions of first-degree robbery, third-degree assault, theft of a firearm, second-degree conspiracy, and possession of a firearm by a person prohibited.  The charges stemmed from an assault and robbery of Jose Acobe outside the Golden Fleece Tavern on Loockerman Street in Dover.

(2)    Downs raises two issues on appeal. First, he argues that the Superior Court erred by admitting a hearsay statement relating to whether the SUV that Downs raided after the assault of Acobe contained a gun—the alleged theft of which formed the basis of the firearm-theft and person-prohibited charges—and that such

error was not harmless. Second, Downs argues that there was insufficient evidence to support four of his convictions.

(3) We reject Downs' insufficient evidence claims, but we agree that the Superior Court erred by admitting the hearsay statement, and we conclude that the error was not harmless. Accordingly, we affirm Downs' convictions of first-degree robbery, third-degree assault, and second-degree conspiracy and vacate in part Downs' convictions of theft of a firearm and possession of a firearm by a person prohibited.

\* \* \*

(4) On the evening of September 23, 2016, Acobe went to the Golden Fleece Tavern. Acobe drove a white Chevrolet Blazer ("SUV") that he had borrowed from his aunt and parked it across the street from the bar. After ordering a beer, Acobe left the bar and returned to the SUV to apply cologne. While outside, Acobe noticed a group of men looking at him strangely. After this encounter, Acobe returned to the bar to pay for his beer. Several of the men from outside then entered the Golden Fleece and stared at Acobe. The men from outside then left the Golden Fleece.

(5) Feeling uncomfortable and scared, Acobe also decided to leave the Golden Fleece. But as soon as Acobe walked into the street, a man punched him in the head, knocking him unconscious. When Acobe regained consciousness, he saw

2

a crowd of people standing around him and discovered that his cell phone and wallet were missing.

(6) Emergency medical technicians and Corporal Brian Wood of the Dover Police Department responded to the scene. While emergency medical personnel attended Acobe, a Golden Fleece employee told Corporal Wood that something had been taken from the SUV. Upon approaching the SUV, Corporal Wood noticed that the driver's side rear door was open a couple of inches. Corporal Wood inspected the SUV and found a box of shotgun shells on the driver's seat.

(7) Meanwhile, Acobe was taken to Kent General Hospital. After inspecting the SUV, Corporal Wood went to the hospital to interview Acobe. Acobe told Corporal Wood that "unknown black males had struck him and taken his phone."[1]

(8) Upon his return to police headquarters, Wood reviewed footage from surveillance cameras near the Golden Fleece. The footage showed men walking from the front of the tavern to Acobe's SUV, entering Acobe's SUV, removing an object, and leaving. The footage then showed the men split up and enter two vehicles: a silver Mercedes-Benz and an orange Dodge Charger. After reviewing the footage, Corporal Wood turned the investigation over to Detective Christopher Bumgarner.

---

[1] App. to Am. Op. Br. at A291 ("A__" hereafter).

3

(9)     Detective Bumgarner examined more surveillance footage that had been captured earlier that night.  In the footage, he saw a group of people, one of whom he identified to be Downs, walk to Irish Mike's, another bar.  When the group left Irish Mike's, they headed toward the tavern. As they were walking, one of the members of the group peered inside Acobe's SUV.

(10)    In the footage, Detective Bumgarner saw a few members of the group entered the Golden Fleece while Downs and other members of the group waited outside.  As mentioned, Acobe then walked out of the Golden Fleece only to be punched in the head by an assailant.  Detective Bumgarner identified that assailant as Downs.  After Acobe fell, Detective Bumgarner could not see whether Downs and the group were kicking Acobe or taking his belongings due to a light pole obscuring the camera's view.

(11)    Following the assault, Downs and two others from the group approached Acobe's SUV.   Based on his training and experience, Detective Bumgarner thought that the two others were acting as lookouts for Downs.  One of these lookouts opened the front door of the SUV while Downs opened the back door and removed "a large, long object."[2]  Detective Bumgarner believed the object was either a rifle or a shotgun based on the butt, barrel protrusion, and shape of the object, but also acknowledged that it could have been a BB gun or other air rifle.  Downs

---

[2] A72.

4

then walked away from the SUV at a brisk pace, directly passing under a camera at Bradford and Loockerman Streets which allowed Detective Bumgarner to identify him.

(12) Other cameras showed the orange Charger and the silver Mercedes-Benz drive away. The Mercedes-Benz followed the Charger until the Mercedes-Benz stopped at a townhouse on Reed Street. There, a person got out of the Mercedes-Benz, took out a long object,[3] walked to the townhouse, and left the townhouse without the object. The Charger stopped at Downs' home.

(13) After reviewing the surveillance footage, Detective Bumgarner interviewed Acobe at his home and photographed his injuries. Acobe told Detective Bumgarner that after his assault, he "discovered that his cousin, Fruto Cantres, that his [Cantres'] shotgun had been removed from the vehicle."[4] Additionally, Acobe told Detective Bumgarner that Cantres "had left [a shotgun] in the vehicle and described it as a 12-gauge shotgun."[5]

(14) While at Acobe's home, Detective Bumgarner collected approximately fifteen 12-gauge shotgun shells and a shotgun magazine. After further investigation,

---

[3] Although Detective Bumgarner testified that the object appeared to be a rifle or a shotgun, having reviewed the video, we believe that a reasonable juror could reject that characterization.
[4] A266.
[5] A273.

5

Detective Bumgarner discovered that Cantres had purchased a Marlin Model 55, 12-gauge shotgun in Newark, Delaware, about two years before Acobe's assault.

(15) A week after the robbery, Corporal Wood found the orange Charger parked outside of Downs' home and the silver Mercedes-Benz parked down the street.

(16) The police searched Downs' home pursuant to a warrant but they did not find Acobe's cell phone, wallet, or Cantres' shotgun.

(17) On January 1, 2018, Cantres died of a chronic illness. He was accordingly unable to testify at Downs' subsequent trial.

\* \* \*

(18) On appeal, Downs first argues that the Superior Court erred by admitting the following testimony by Detective Bumgarner regarding what Acobe had told him during the investigation: "[Acobe] then later discovered that his cousin, Fruto Cantres, that his shotgun had been removed from the vehicle."[6]

(19) At trial, before Detective Bumgarner testified, Acobe took the stand. Acobe testified that he learned that Cantres never recovered his shotgun, even though Acobe also testified that he "never" got the SUV back after the assault. And Acobe testified that "I don't remember" in response to the question "In the car that evening was there a firearm?" These statements gave Downs reason to believe that

---

[6] Am. Op. Br. 4; A266.

Detective Bumgarner would offer inadmissible double hearsay when testifying about his interview of Acobe.

(20) According to Downs, Detective Bumgarner's testimony was inadmissible double hearsay because Acobe's statement to Detective Bumgarner was not based on Acobe's personal knowledge, but rather on a later out-of-court statement made by Cantres to Acobe that Cantres' shotgun had been in the SUV.[7] Downs' contention regarding the basis of Acobe's knowledge of this fact was borne out by Acobe's later testimony that he had no personal knowledge that there was a shotgun in the SUV and that he only later learned from Cantres that Cantres' shotgun was in the SUV that night.[8]

(21) The Superior Court nevertheless admitted Detective Bumgarner's testimony because it thought that the testimony was admissible via 11 *Del. C.* § 3507, which provides that "the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value."

---

[7] We note that the State initially offered Bumgarner—not Acobe—to testify as to Acobe's prior statement. A263. By the time Acobe testified as to the contents of his prior statement, the Superior Court had already admitted the prior statement.

[8] A322. In fairness to the Superior Court, Acobe gave that testimony after the Superior Court had already ruled on the hearsay objection. Still, we think that given the testimony that had been presented, Acobe's comments to Detective Bumgarner were more likely than not to have been hearsay, and if there were questions as to the admissibility of the testimony in question, the Superior Court could have held a hearing outside of the presence of the jury to determine if that was the case.

(22) Ordinarily, we review a trial court's evidentiary rulings for abuse of discretion. But we review *de novo* rulings where the alleged error infringes upon a constitutionally protected right—here, the right to confrontation. If we find error, we next examine whether the error was harmless.[9] A constitutional error is harmless only if the State has proven "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[10] We must reverse if we find that the error was not harmless.[11]

(23) "If double hearsay is being offered into evidence, each aspect must qualify independently as an exception to the hearsay rule."[12] Section 3507 acts as such an exception, permitting the admission of out-of-court statements of a present witness available for cross-examination.

---

[9] We automatically reverse where a constitutional error is structural, *Brice v. State*, 815 A.2d 314, 324 (Del. 2003) (discussing the six types of structural error, each inapplicable here), *overruled on other grounds by Rauf v. State*, 145 A.3d 430 (Del. 2016), but otherwise, we conduct a harmless error analysis.

[10] *Dawson v. State*, 608 A.2d 1201, 1204 (Del. 1992).

[11] *Van Arsdall v. State*, 524 A.2d 3, 11 (Del. 1987) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)); *Williams v. State*, 141 A.3d 1019, 1035 (Del. 2016).

[12] *Demby v. State*, 695 A.2d 1152, 1162 (Del. 1997).

(24) Although § 3507 creates an exception to one layer of hearsay, it does not permit a court to admit otherwise-inadmissible embedded hearsay within the § 3507 statement[13]—in this case, a statement from a deceased declarant, Cantres.

(25) With respect to Detective Bumgarner's testimony, § 3507 provided an exception for the first layer of hearsay—Acobe's out-of-court statement to Detective Bumgarner—because Acobe was present and available for cross-examination. But § 3507 does not cover the second layer of hearsay—Cantres' presumed out-of-court statement to Acobe. Neither would Cantres' presumed statement to Acobe have satisfied any other hearsay exception, such as the exception for statements made under the belief of imminent death. Accordingly, Detective Bumgarner's testimony regarding what Acobe presumably learned from Cantres about the shotgun is inadmissible hearsay, and its admission deprived Downs of his constitutional right to confrontation.

(26) The State argues on appeal that the Superior Court did not err in admitting Detective Bumgarner's testimony because § 3507(b) does not require that the witness offer consistent trial testimony. But § 3507(b) does not render double

---

[13] For example, in *Demby*, the Superior Court, applying § 3507, admitted the victim's out-of-court statement to a police officer that a third party had told the victim that the third party saw the defendant shoot the victim. We reversed, holding that "any hearsay within [the victim's] section 3507 statement was inadmissible unless it was permitted by an exception to the hearsay rule." *Id.* at 1161. Because the victim herself had not seen who shot her, the victim's out-of-court statement telling the officer what the third party told her constituted hearsay within hearsay. Therefore, "the statement attributed to [the third party was] inadmissible hearsay included within hearsay." *Id.* (quoting D.R.E. 805).

9

hearsay admissible, which is the issue in this case. Furthermore, the testimony in this case is not fundamentally inconsistent. Therefore, § 3507(b) is irrelevant.

(27) When conducting harmless-error analyses after finding error in the admission of evidence, we distinguish between garden-variety evidentiary missteps and "evidentiary errors of constitutional magnitude." Where the error did not implicate constitutional rights, "[t]he well-established rule is that where the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction, error in admitting the evidence is harmless."[14] But where, as here, the error violated protected constitutional rights, an error is harmless only if the State proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."[15]

(28) We cannot conclude beyond a reasonable doubt that the jury's verdict would have been the same without Detective Bumgarner's testimony. Although the jurors viewed the videos themselves,[16] it is reasonable to think that their viewing was influenced by Detective Bumgarner's testimony on whether there was in fact a shotgun in the SUV. That fact was critical and testimony regarding that fact likely affected the jury's determination that the item Downs removed was a shotgun.

---

[14] *Johnson v. State*, 587 A.2d 444, 451 (Del. 1991).

[15] *Dawson v. State*, 608 A.2d 1201, 1204 (Del. 1992); *Johnson*, 587 A.2d at 451; *Delaware v. Van Arsdall*, 475 U.S. 673 (1986).

[16] To be sure, the footage from the Bradford and Loockerman intersection camera depicted Downs walking away from the SUV with an object that reasonable jurors might conclude was a long gun.

(29) There was a substantial gap in the State's proof of whether there was a shotgun in the SUV. At trial, Detectives Bumgarner and Michael Wilson, another investigating officer, acknowledged that they could not say whether the object taken from the SUV might have been—besides a shotgun—a BB gun, pellet rifle, or air rifle.[17] None of those latter weapons are firearms within the meaning of the firearms charges that Downs faces.[18]

(30) During its closing statement, the State itself highlighted that this gap in its case was filled with the challenged hearsay statement: "How do you know it's really a gun? . . . What is the evidence to support that? First, Mr. Acobe told the officers initially, yes, my cousin's shotgun was in the car and it was stolen."[19]

(31) Absent Detective Bumgarner's testimony as to what Cantres told Acobe, we think a reasonable juror could very well have entertained reasonable doubt as to whether Downs took a firearm from the SUV or instead a non-firearm object and therefore could have voted to acquit Downs on the firearms charges.

(32) Because a reasonable juror might have voted to acquit and thus changed the outcome of the trial, we cannot find that the error was harmless beyond a reasonable doubt. We accordingly vacate Downs' convictions for theft of a firearm and possession of a firearm by a person prohibited.

---

[17] See A134, A190.
[18] See 22 Del. C. § 222(12) ("'Firearm' . . . does not include a BB gun.").
[19] A437.

* * *

(33)   Downs also raises insufficient evidence challenges as to his convictions of first degree robbery and second degree conspiracy.[20]

(34)   This Court reviews "claims of insufficient evidence *de novo*[] to determine whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt."[21] We note that this is a substantially different standard of review than what we applied in the harmless-error analysis above.

(35)   As recited above, there were substantial facts, each well-established by admissible and admitted evidence, that support Downs' convictions of the robbery, assault, and conspiracy charges.

(36)   We also note that Downs' argument that the State failed to prove conspiracy because "there was no evidence that [he] intended to aid or abet anyone in committing a theft of personal property from [Acobe]"[22] is misplaced.  It appears that Downs has conflated the requirements of conspiracy with those of accomplice liability; intent to aid or abet someone else is not a required element of conspiracy.[23]

---

[20] Downs also raises insufficient evidence challenges as to his convictions of theft of a firearm possession of a firearm by a person prohibited, but because we vacate those convictions due to the hearsay issue, we need not reach whether they were supported by sufficient evidence.
[21] *Neal v. State*, 3 A.3d 222, 223 (Del. 2010).
[22] Am. Op. Br. 26.
[23] 11 *Del. C.* § 511–13 (conspiracy defined; conspiracy only requires "intent to promote or facilitate" the commission of a crime).

That said, the evidence produced at trial readily permitted a rational trier of fact to conclude beyond a reasonable doubt that the State had proven the elements of conspiracy, and Downs was not prejudiced by this slight misstatement.

\* \* \*

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED as to Downs' convictions of first-degree robbery, third-degree assault, and second-degree conspiracy and VACATED as to Downs' convictions of theft of a firearm and possession of a firearm by a person prohibited.

BY THE COURT:


*/s/ Gary F. Traynor*
Justice